UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

VICTOR HUGO OROZCO,
Plaintiff,

v.

CVS HEALTH CORPORATION,
LITTLER MENDELSON P.C.,
NAVEX GLOBAL, INC.,
BC PARTNERS, INC.,
VISTA EQUITY PARTNERS,
MORGAN, BROWN & JOY LLP,
BRACEWELL LLP,
FORT WORTH HUMAN RELATIONS COMMISSION,
HEATHER PIERCE,
CHANDLER GORDON,
Defendants.

Civil Action No. 4:24-cv-00885-P-BJ

---

SECOND AMENDED COMPLAINT

DEMANDING $26 BILLION IN DAMAGES
(RICO, 18 U.S.C. § 1961–1968)

---

I. INTRODUCTION

This action is brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, for damages arising from a coordinated and ongoing enterprise involving private corporations, law firms, and a public entity. The enterprise targeted Plaintiff through a pattern of racketeering activity including wire fraud, obstruction of justice, unauthorized practice of law (UPL), evidence tampering, whistleblower retaliation, and civil rights violations.

Plaintiff alleges that this enterprise deliberately retaliated against him after he reported workplace misconduct and discrimination, resulting in economic devastation, psychological trauma, and the wrongful death of his unborn child.

---

II. THE ENTERPRISE STRUCTURE – § 1962(c)

The RICO enterprise includes the following interrelated actors:

CVS Health Corporation – Central node of the enterprise, employer of Plaintiff, engaged in document manipulation, false filings, and retaliation.

NAVEX Global, Inc. – Operated CVS's whistleblower hotline, breached confidentiality and exposed Plaintiff's identity.

Littler Mendelson, P.C. – Engaged in post-termination obstruction, manipulated facts in filings and defense tactics, involved in concealing retaliation evidence.

Morgan, Brown & Joy LLP – Falsified legal citations, denied Plaintiff's right to a fair mediation, and participated in procedural obstruction.

Bracewell LLP – Legal actors aligned with CVS and the City of Fort Worth to delay records production and interfere with civil redress.

Fort Worth Human Relations Commission (FWHRC) – Provided cover for CVS by mishandling the investigation, concealing critical evidence, and granting improper extensions to CVS's counsel.

BC Partners – Parent company of NAVEX, exerted control over policy and conduct while insulating itself from liability.

Vista Equity Partners – Prior NAVEX owner; previously fined $139 million for tax evasion; maintained influence over enterprise strategy.

Heather Pierce & Chandler Gordon –Littler Mendelson attorneys who gave legal directives without licensure, participated in fraud and witness tampering.

---

III. JURISDICTION AND VENUE

This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c). Venue is proper under 28 U.S.C. § 1391(b), as the acts occurred within this District and involved public entities located in Fort Worth, Texas.

---

IV. PREDICATE RICO ACTS – § 1961(1)

A. Wire Fraud (18 U.S.C. § 1343)

1. Defendants used electronic communications to coordinate retaliatory actions, send falsified termination documentation, and conceal internal complaints.

2. Emails from Pierce and Gordon ordered Plaintiff's removal and misrepresented Plaintiff's conduct to HR and outside counsel.

3. Morgan, Brown & Joy LLP and Littler Mendelson filed motions containing falsified statements and misquoted case law, including:

Arredondo v. Schlumberger Ltd., 583 F. Supp. 3d 783

Texas Dep't of Aging & Disability Servs. v. Loya, 491 S.W.3d 920

B. Obstruction of Justice (18 U.S.C. § 1503, 1512)

1. CVS redacted internal complaints, skipped case numbers, and falsified metadata in HR reports.

2. NAVEX tampered with digital complaint logs, removing timestamps and references that would support retaliation claims.

3. Morgan, Brown & Joy LLP and Bracewell LLP assisted in concealing critical evidence and delaying public records via false justification.

4. Fort Worth HRC granted repeated extensions to CVS's attorneys, ignored missing categories in the investigative report, and never interviewed key witnesses.

C. Unauthorized Practice of Law (Tex. Gov't Code § 81.101)

1. Heather Pierce, not licensed in Texas, directed internal investigations and legal strategy.

2. Communications show her overriding counsel and instructing actions that should only be directed by licensed legal representatives.

D. Retaliation / Identity Disclosure

1. NAVEX revealed Plaintiff's identity to CVS immediately after the ethics complaint was submitted.

2. This breach triggered a series of retaliatory actions including verbal harassment, false allegations, and eventual termination.

3. FWHRC knew of the retaliation and still accepted falsified evidence from CVS and their attorneys.

---

V. DAMAGES

Lost wages, future earnings, and benefits: $250,000,000

Psychological harm, miscarriage, and housing instability: $750,000,000

Treble damages under 18 U.S.C. § 1964(c): $3,000,000,000

Punitive damages for willful misconduct: $23,000,000,000

Total damages sought: $26,000,000,000

---

VI. RELIEF REQUESTED

Plaintiff requests the following relief:

1. Monetary judgment of $26 billion as stated above.

2. Criminal referrals to the U.S. Attorney's Office for RICO, wire fraud, obstruction, and UPL.

3. Permanent injunction against Defendants from engaging in further retaliation or destruction of evidence.

4. Order to dissolve or reorganize CVS Health Corporation under Texas corporate law.

5. Court-authorized piercing of the corporate veil, holding BC Partners, Vista, and NAVEX jointly liable.

6. Court-appointed legal counsel and expert assistance at CVS's expense.

7. Trial by jury on all claims so triable.

---

DATED: March 27, 2025
RESPECTFULLY SUBMITTED,
/s/ Victor Hugo Orozco
Victor Hugo Orozco
3408 Ada Street
Fort Worth, TX 76105
(817) 822-8994
Pro Se Plaintiff

# 1. Exhibit 1: BC Partners' Control Over NAVEX

This transcript was exported on Mar 21, 2025 - view latest version here.

Sean Thompson (00:04):

Hi, I am Sean Thompson, president,

Non Conlin (00:06):

CEO here at

Sean Thompson (00:07):

NavX. Hi, I'm Bob Conlin. I am the former CEO of NavX. Now, executive chairman

Non Conlin (00:13):

NavX is a global leader in governance, risk and compliance software that includes leading products and ethics and compliance, integrated risk management and ESG. Our mission is to help our customers promote ethical workplace cultures to help protect our customers brands from risk and to promote sustainable business practices. Our vision is to create an integrated platform experience that ultimately predicts and mitigates risk.

Sean Thompson (00:42):

NavX started working with BC Partners in September of 2018. Obviously, we did a lot of pre-work with them before they acquired us, but in September of 2018, they became the majority owner. And since that time, they've helped us, collaborated with us very closely and helped us continue to grow. BC Partners is a really good fit for NavX for a couple of reasons. Number one is there's a shared vision. We both have a vision for growth. We both have a vision for establishing NAVEX and continuing our establishment as the number one player in the integrated risk management ethics, compliance, and ESG space. And what I particularly like about working with BC Partners in that collaborative format is the way that they engage with us and help us do specific studies bring to bear subject matter expertise that they may have on our international expansion. They've been very helpful, so they've just been a very solid collaborative partner for us. Over time.

Non Conlin (01:38):

I often tell them that they're an extension of our team. Not only are they very collaborative, but they're also very strategic. They really help us think about where are we going as a company? Where do we take our roadmap from a product perspective? What do we do from an executive team and a leadership perspective? What are the things that we may want to buy from an m and a perspective? And so I always say that the BC partners team has been a great extension of ours, not just as a financing team, but an overall owner and aligned partner.

Sean Thompson (02:11):

BC partner team has been very supportive on a couple of challenges I would say, or initiatives in a few. They've helped us, for example, in expanding into Europe very successfully there. They've helped us in terms of our pipeline development programs. And then more recently they actually were very helpful in bringing Sean on board to replace me as CEO. In my elder year state, I felt like it was important to bring on the best guy we could find, and BC Partners was really, really helpful in helping us secure Sean and then frankly get him to come here to work because he had so many other offers. And I think BC Partners as a partner was able to demonstrate to him that they would provide a very collaborative and a very engaging partnership for us.

Non Conlin (02:57):

This transcript was exported on Mar 21, 2025 - view latest version here.

With the support of BC Partners, there's a lot of opportunities for us to take advantage of. First they helped us move into Europe, and that was a very successful geographic expansion. We now have our site set on expanding further in Asia and other geographies around the world. So the international opportunity with BC Partners is really compelling for us. The second thing is, is that BC Partners has also been a great partner in helping us think through and evaluate our m and a strategy. So how do we buy our way, if you will, to growth in the future? And they've been a super valuable partner in that regard. And then the last thing I would say is that they're going to continue to help us think about our strategy going forward. Not only what we do from an m and a perspective, international geographic expansion perspective, but also from a product perspective and take advantage of the opportunity that we have in the future.

Exhibit 4: Navex/CVS
Communications

**Case: 2023-7-175721 - EP Call Center**
**Central Employee Relations (CVS)**
**Employee Regulatory Issues : Discrimination : Gender/Gender Identity or Expression**

Case Snapshot

**Opened:**  07/30/2023 3:02 PM
**Days open:**  51
**Last modified:**  09/20/2023 10:40 AM
**Date closed:**  09/20/2023 10:40 AM
**Intake method:**  EP Call Center
**Status:**  Closed
**Alert:**  Green

General Case Info

**Case number:**
2023-7-175721

**Received/Reported date:**
07/30/2023

**Language:**
English

**Assigned tier:**
Central Employee Relations (CVS)

**Issue**

**Primary issue:**
Employee Regulatory Issues : Discrimination : Gender/Gender Identity or Expression

**Summary:**
A Retail Store Manager alleges that a District Leader discriminated against him based on gender.

Case Details Show Original Case Details

**Reported tier information**

**Case type:**
Allegation/Issue

**Intake method:**
EP Call Center

**Location**

**Organization/Building name:**
CVS Front Store

**Location/Address:**
Store - 6794 - TX - FORT WORTH - 6794
2706 JACKSBORO HWY

**City:**
FORT WORTH

**State/province:**
TX

**ZIP/postal code:**
76114

**Country/Territory:**
United States

**Department/Store:**
6794

**Function/Type:**
Store

**Area:**
7

**Region:**
59

**District:**
8

**Reporter Information**

**Reporter anonymous:**
No

**Reporter first name:**
Victor

**Reporter last name:**
Orozco

**Phone number:**
817-822-8994

**Email address:**
victorscraiglist@gmail.com

**Contact availability:**
any time

**Case Information**

**Employee identification #:**
2264925

**Reporter Relationship:**
Current/Active employee

**Person(s) engaged in behavior:**
Reginald Koonts - district leader

**Supervisor or management is involved?**
Yes

**If management involved then who?**
Reginald Koonts, district leader

**Is management aware of this problem?**
Yes

**What is the general nature of this matter?**
Victor feels as though he has been treated unfairly after showing that he has begun his transition.

**Where did this incident or violation occur?**
at the location

**Specific or approximate time this incident occurred:**
unknown

**How long do you think this problem has been going on?**
Don't know

**How did you become aware of this violation?**
It happened to me

**Are there any other witnesses?**
No

**Details:**
***Compliance note to Colleague Relations: CHR. Please send findings of investigation. ***

Victor began to start showing signs of his transition by dyeing his hair and showing more feminine features. Victor has since realized that he has been treated differently after doing so. Victor feels as though Reginald has it out for him in a sense. Store managers are set to schedule themselves for at least 45 hours a week, but nothing more than 45 hours is paid for. Victor has had weeks in which he will work 7 nights a week, and it has come to a point where he is unable to have one day off. If Victor is scheduled for under 45 hours, he will get yelled at. Victor fears putting time off because he does not want anyone to think that he is slacking, as he attempts to put in an immense amount of effort. During Victors 6-month review, he was given a level one. Victoria (last name unknown), store manager, was only given a verbal warning. Victor and Victoria have been in the same position, and this came off as odd to Victor. Victor would like to report these concerns for them to be addressed and situated moving forward.

The caller began to file a report regarding employee regulatory issues. Due to the caller terminating the call prior to the completion of intake, no additional details were gathered and NAVEX was unable to read back the report. The caller did not receive access information (report key and password) and will be unable to review or follow up on this report.

**Legacy information**

**Follow-ups**

**Reporter Additional Information**
There are no additional notes for this incident.

**Questions/Comments and Reporter Responses**

**07/30/2023 3:02 PM - System**
**Comment:** Thank you for contacting the CVS Health Ethics Line. We are in receipt of your report. Please check back periodically, as we may need additional information to assist with our review. If you require emergency assistance or there is an immediate threat of harm/danger, please call 911.

**07/31/2023 8:27 AM - .Shukla, Shivam**
**Comment:** Thank you again for reporting your concern to the Ethics Line. Your concern has been forwarded to Colleague Relations. Colleague Relations is part of the Human Resources department that handles matters raised by colleagues who may not wish to discuss certain issues with their management.

If you provided your contact information when making this report, a member of the Colleague Relations team will contact you directly. If you initially chose to file this report anonymously and would now prefer to be contacted directly, please respond with your contact information and we will provide it to the Colleague Relations team.

**09/20/2023 10:40 AM - .Shukla, Shivam**
**Comment:** Thank you again for reporting your concern to the Ethics Line. Colleague Relations has completed its review of your concern. Your concern has been brought to the attention of the appropriate level of management and, when applicable, the appropriate actions have been taken. This Ethics Line report is now closed.

Assignments & Access



Case assignee(s): ████████ ; .Shukla, Shivam (Primary)
Restricted access:  None
Case access list:

Case Due Date:  07/31/2023

Participants

| Name | Job Title | Relationship | Role | Results | Notes |
|------|-----------|--------------|------|---------|-------|

| Reginald Koontz | District Leader, FS | District Leader | Implicated Person | None |
| Victor Orozco | Store Manager-07 | Employee | Reporter | None |
| Victoria (last name unknown) | store manager | Employee | Other | None |
| Colleague Relations | None | Employee Relations | Investigator | None |
| Amanda Reed | Region Director, FS | Region Director | Other | None |

## Attachments

### Files

| File | Category | Date | Description |
|------|----------|------|-------------|
| Investigation Report - Case 02507041.pdf | Investigation Summary | 09/19/2023 07:11:00 AM | |

## Synopsis

### Outcome of case

**Primary outcome:**
Escalated to Central ER

**Secondary outcome 1:**
No Result

**Secondary outcome 2:**
No Result

**Action taken:**
No Action Taken

### Additional details

**Case Status:**
09/20/2023 10:38 AM - .Shukla, Shivam
Received the investigation report from Colleague Relations investigator; allegation was found to be unsubstantiated based on interviews with the implicated District Leader.

07/31/2023 8:32 AM - .Shukla, Shivam
Escalated to Colleague Relations for investigation.

### Investigator

**Investigator First Name:**
Colleague

**Investigator Last Name:**
Relations

### General

**Highly Sensitive:**
No

9

**International Matter?**
No

**Attorney-Client Privilege?**
No

**Old Issue Type:**
Discrimination & Affirmative Action

## Case Management

**Allegation Summary:**
A Retail Store Manager alleges that a District Leader discriminated against him based on gender.

**Finding of Fact:**
Per Heather Haller, Colleague Relations: There is no evidence to support that DL, Reginald, was treating SM, Victor, differently due to his gender identity. Victor was issued a Level I for OPI / Performance concerns on 7/26/23. There were 4 other Store Managers under DL, Reginald that were also issued Level I's in July 2023 for performance related concerns.

**Resolution:**
No further action required.

**Result of Investigation:**
Unsubstantiated

**Outcome Summary:**
Unsubstantiated. So they took my complaint and went up to Reggie and asked him if he was guilt since he said not then my claims were unsubstantiated.

The investigation, which included an interview with the implicated District Leader, found no evidence to support the District Leader's allegation that the implicated District Leader discriminated against him based on gender.

## Compliance Considerations

**Medicaid, Medicare, Commercial:**
Not Applicable

**Government Employee Program(s)?**
No

## Synopsis Notes

**Synopsis notes:**
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Investigation Report
Case Owner: Heather Haller Contact Name: Victor Orozco
Date Report Finalized: Employee ID: 2264925
EP Case Number: 2023-7-175721 Title Description: Store Manager-07
Case Number: 02507041 Business Unit: Store
Date Case Opened: 08/01/2023 Employment Status: A
Date Closed with Complainant: FLSA: E
Type: Employee Regulatory Issues Harassment & Other
Workplace Conflict Original Hire Date: 10/20/2022
Location Code: S06794-FS Last Day Worked:
Summary of Allegations/Issues, Purpose of Investigation: \*\*\*Compliance note to Colleague Relations: CHR. Please send findings of investigation. \*\*\*----Victor began to start showing signs of his transition by dyeing his hair and showing
more feminine features. Victor has since realized that he has been treated differently after doing so. Victor feels as though Reginald has it out for him in a sense. Store managers are set to schedule themselves for at least 45 hours a
week, but nothing more than 45 hours is paid for. Victor has had weeks in which he will work 7 nights a week, and

it has
come to a point where he is unable to have one day off. If Victor is scheduled for under 45 hours, he will get yelled at.
Victor fears putting time off because he does not want anyone to think that he is slacking, as he attempts to put in an
immense amount of effort. During Victors 6-month review, he was given a level one. Victoria (last name unknown), store
manager, was only given a verbal warning. Victor and Victoria have been in the same position, and this came off as odd
to Victor. Victor would like to report these concerns for them to be addressed and situated moving forward. ----The caller
began to file a report regarding employee regulatory issues. Due to the caller terminating the call prior to the completion
of intake, no additional details were gathered and NAVEX was unable to read back the report. The caller did not receive
access information (report key and password) and will be unable to review or follow up on this report.
Name Title Role Interviewed Date Credibility Assessment
Reginald
Koontz
District
Leader, FS
Individual
Named -
Accused
Yes 09/07/2023
Credible. The Level I was issued because a hub task
came over from Compliance that tells him to put certain
SM's who are out of compliance on a Level I. There were
4 SM's who received it. ==Victor never reported that he had
concerns with work life balance.== DL confirmed he
requested and went on vacation Aug 28 – Sept 2. DL has
never denied vacation requests. DL and the company's
expectation is that all SM's schedule and work 45 hours.
Some may work over that due to staffing issues but no
one has come to him with regards to needing help with
working 45 hours.
Amanda
Reed
Region
Director, FS



Victor
Orozco
Store
Manager-07



Original
contact
Issue Rule or Policy Fact Finding Substantiation
Was Victor issued a
Level I due to his
transition?
Against
Discrim/Harass/Retal:

████████ There is no evidence to support that DL, Reginald,
was treating SM, Victor, differently due to his gender
identity. Victor was issued a Level I for OPI /
Performance concerns on 7/26/23. There were 4
other Store Managers under DL, Reginald that were
also issued Level I's in July 2023 for performance
related concerns.
Unsubstantiated
Is DL, Reginald,
holding SM, Victor to a
different standard when
it comes to working /
scheduling 45 hours
per week?
Against
Discrim/Harass/Retal:

████████
Root Cause:
If "Other" please describe:
The information in this report constitutes "Confidential Information" and/or "Proprietary Information" as defined by CVS
Health policies and must be handled accordingly. The report should not be shared with anyone outside of CVS Health
except where mandated by law or where authorized in advance by the CVS Legal Department. The report should only be
shared within CVS Health with colleagues who have a clear business need to see it and have been expressly authorized
by the author to see it. To the extent that any information in this report qualifies for a higher level of protection, such as
information that is "PII" or "PHI" under HIPAA, the report must be safeguarded in accordance with those heightened
protections. Questions regarding those protections should be directed to the CVS Legal or Privacy Departments. To the
extent that this report was prepared at the request or direction of the CVS Legal Department in the course of providing
legal advice to the Company or to the extent that the report includes attorney work product, the report shall be considered
privileged. Finally, this report may contain information about complaints and other protected activity by colleagues. CVS
Health reiterates here that retaliation of any kind against an employee for making a complaint or otherwise providing
information regarding a perceived violation of company policy or law is strictly prohibited.
****************************************************************
From: Haller, Heather D ████████████████
Sent: Friday, September 8, 2023 12:49 AM
To: ████████████████████████    Shukla, Shivam ████████████████
Subject: 2023-7-175721

Hello,

Attached is the report for 2023-7-175721.

*Between Navex & CVS*

Have a good day!

Colleague Relations - Addressing Employee Relations Concerns with Care, Respect and Integrity
Heather Haller (She.Her.Hers.) | Senior Manager, Investigations



CVS Health | One CVS Drive, MC 1113, Woonsocket, RI 02895
CONFIDENTIALITY NOTICE: This communication and any attachments may contain confidential and/or privileged information for the use of the designated recipients named above. If you are not the intended recipient, you are hereby notified that you have received this communication in error and that any review, disclosure, dissemination, distribution or copying of it or its contents is prohibited. If you have received this communication in error, please notify the sender immediately by email or telephone and destroy all copies of this communication and any attachments.

## Tasks
Secondary issue type not assigned to outcome. Assign/Delete issue type to continue

Colleague Relations Follow Up
~~Cancel~~

| Assigned To | Status | Priority | Duration | Due Date | Start Date | Completed Date |
|---|---|---|---|---|---|---|
| .Shukla, Shivam | Completed | none | none | 09/19/2023 | 07/31/2023 | 09/20/2023 |

Issue : Discrimination : Gender/Gender Identity or Expression

| Assigned To | Status | Priority | Duration | Due Date | Start Date | Completed Date |
|---|---|---|---|---|---|---|
| [none] | Completed | none | none | | 07/31/2023 | 09/20/2023 |

## Case Notes

**09/20/2023 10:38 AM - .Shukla, Shivam**
Received the investigation report from Colleague Relations investigator; allegation was found to be unsubstantiated based on interviews with the implicated District Leader.

**07/31/2023 8:32 AM - .Shukla, Shivam**
Escalated to Colleague Relations for investigation.

## Related Cases

### Cases Marked as Related to This Case

| Case # | Tier | Assignee(s) |
|---|---|---|
| 2023-7-175722 | Central Employee Relations (CVS) | ██████ ; .Shukla, Shivam |

# Info Contributors

None

9

**Case: 2023-7-175722 - EP Call Center**
**Central Employee Relations (CVS)**
**Employee Regulatory Issues : Discrimination : Gender/Gender Identity or**
**Expression**

Case Snapshot

**Opened:** 07/30/2023 3:15 PM
**Days open:** 51
**Last modified:** 09/20/2023 10:37 AM
**Date closed:** 09/20/2023 10:37 AM
**Intake method:** EP Call Center
**Status:** Closed
**Alert:** Green

General Case Info

**Case number:**
2023-7-175722

**Received/Reported date:**
07/30/2023

**Language:**
English

**Assigned tier:**
Central Employee Relations (CVS)

**Issue**

**Primary issue:**
Employee Regulatory Issues : Discrimination : Gender/Gender Identity or Expression

**Summary:**
A Retail Store Manager alleges that a District Leader discriminated against him based on gender.

Case Details Show Original Case Details

**Reported tier information**

**Case type:**
Allegation/Issue

**Intake method:**
EP Call Center

**Location**

**Organization/Building name:**
CVS Pharmacy

**Location/Address:**
Store - 6794 - TX - FORT WORTH - 6794
2706 JACKSBORO HWY

**City:**
FORT WORTH

**State/province:**
TX

**ZIP/postal code:**
76114

**Country/Territory:**
United States

**Department/Store:**
6794

**Function/Type:**
Store

**Area:**
7

**Region:**
59

**District:**
8

**Reporter Information**

**Reporter anonymous:**
No

**Reporter first name:**
Victor

**Reporter last name:**
Orozco

**Phone number:**
817-822-8994

**Email address:**
victorscraiglist@gmail.com

**Contact availability:**
any time

**Case Information**

**Employee identification #:**
2264925

**Reporter Relationship:**
Current/Active employee

**Person(s) engaged in behavior:**
Reginald Koonts - district leader

**Supervisor or management is involved?**
Yes

**If management involved then who?**
Reginald Koonts, district leader

**Is management aware of this problem?**
Don't Know / Don't Wish To Disclose

**What is the general nature of this matter?**
Victor feels as though he has been treated unfairly after showing that he has begun his transition.

**Where did this incident or violation occur?**
at the location

**Specific or approximate time this incident occurred:**
unknown

**How long do you think this problem has been going on?**
Don't know

**How did you become aware of this violation?**
It happened to me

**Are there any other witnesses?**
No

**Details:**
***Compliance note to Colleague Relations: CHR. Please send findings of investigation. ***

Victor had previously filed a report through the hotline. Victor had noticed that he had been treated differently by Reginald after showing signs of transitions. Victor was not provided with access codes for the report due to him terminating the call previously. Victor would like to gain access to the previously filed report.

**Legacy information**

**Follow-ups**

**Reporter Additional Information**
There are no additional notes for this incident.

**Questions/Comments and Reporter Responses**

**07/30/2023 3:16 PM - System**
**Comment:** Thank you for contacting the CVS Health Ethics Line. We are in receipt of your report. Please check back periodically, as we may need additional information to assist with our review. If you require emergency assistance or there is an immediate threat of harm/danger, please call 911.

**07/31/2023 8:40 AM - .Shukla, Shivam**
**Comment:** Thank you again for reporting your concern to the Ethics Line. Your concern has been forwarded to Colleague Relations. Colleague Relations is part of the Human Resources department that handles matters raised by colleagues who may not wish to discuss certain issues with their management.

If you provided your contact information when making this report, a member of the Colleague Relations team will contact you directly. If you initially chose to file this report anonymously and would now prefer to be contacted directly, please respond with your contact information and we will provide it to the Colleague Relations team.

**09/20/2023 10:35 AM - .Shukla, Shivam**
**Comment:** Thank you again for reporting your concern to the Ethics Line. Colleague Relations has com, '᠈ ᠂ed its review of your concern. Your concern has been brought to the attention of the appropriate level of management and, when applicable, the appropriate actions have been taken. This Ethics Line report is now closed.

## Assignments & Access

**Case assignee(s):** ▮▮▮▮▮▮▮ .Shukla, Shivam (Primary)
**Restricted access:** None
**Case access list:**

[redacted]

**Case Due Date:** 07/31/2023

## Participants

| Name | Job Title | Relationship | Role | Results | Notes |
|---|---|---|---|---|---|
| Reginald Koontz | District Leader, FS | District Leader | Implicated Person | None | |
| Victor Orozco | Store Manager-07 | Employee | Reporter | None | |
| Colleague Relations | None | Employee Relations | Investigator | None | |
| Amanda Reed | Region Director, FS | Region Director | Other | None | |

## Attachments

## Files

| File | Category | Date | Description |
|------|----------|------|-------------|
| Investigation Report - Case 02507041.pdf | Investigation Summary | 09/20/2023 08:14:00 AM | |

## Synopsis

### Outcome of case

**Primary outcome:**
Escalated to Central ER

**Secondary outcome 1:**
No Result

**Secondary outcome 2:**
No Result

**Action taken:**
No Action Taken

### Additional details

**Case Status:**
09/20/2023 10:33 AM - .Shukla, Shivam
Received the investigation report from Colleague Relations investigator; allegation was found to be unsubstantiated based on interviews with the implicated District Leader.

07/31/2023 8:47 AM - .Shukla, Shivam
Escalated to Colleague Relations for investigation.

### Investigator

**Investigator First Name:**
Colleague

**Investigator Last Name:**
Relations

### General

**Highly Sensitive:**
No

**International Matter?**
No

**Attorney-Client Privilege?**
No

**Old Issue Type:**
Discrimination & Affirmative Action

### Case Management

**Allegation Summary:**
A Retail Store Manager alleges that a District Leader discriminated against him based on gender.

**Finding of Fact:**
Per Heather Haller, Colleague Relations: There is no evidence to support that DL, Reginald, was treating SM, Victor, differently due to his gender identity. Victor was issued a Level I for OPI / Performance concerns on 7/26/23. There were 4 other Store Managers under DL, Reginald that were also issued Level I's in July 2023 for performance related concerns.

**Resolution:**
No further action required.

**Result of Investigation:**
Unsubstantiated

**Outcome Summary:**
Unsubstantiated.

The investigation, which included an interview with the implicated District Leader, found no evidence to support the District Leader's allegation that the implicated District Leader discriminated against him based on gender.

**Compliance Considerations**

**Medicaid, Medicare, Commercial:**
Not Applicable

**Government Employee Program(s)?**
No

**Synopsis Notes**

**Synopsis notes:**
*****************************************************************
Investigation Report
Case Owner: Heather Haller Contact Name: Victor Orozco
Date Report Finalized: Employee ID: 2264925
EP Case Number: 2023-7-175721 Title Description: Store Manager-07
Case Number: 02507041 Business Unit: Store
Date Case Opened: 08/01/2023 Employment Status: A
Date Closed with Complainant: FLSA: E
Type: Employee Regulatory Issues Harassment & Other
Workplace Conflict Original Hire Date: 10/20/2022
Location Code: S06794-FS Last Day Worked:
Summary of Allegations/Issues, Purpose of Investigation: ***Compliance note to Colleague Relations: CHR. Please send findings of investigation. ***----Victor began to start showing signs of his transition by dyeing his hair and showing
more feminine features. Victor has since realized that he has been treated differently after doing so. Victor feels as though Reginald has it out for him in a sense. Store managers are set to schedule themselves for at least 45 hours a
week, but nothing more than 45 hours is paid for. Victor has had weeks in which he will work 7 nights a week, and it has
come to a point where he is unable to have one day off. If Victor is scheduled for under 45 hours, he will get yelled at.
Victor fears putting time off because he does not want anyone to think that he is slacking, as he attempts to put in an
immense amount of effort. During Victors 6-month review, he was given a level one. Victoria (last name unknown), store
manager, was only given a verbal warning. Victor and Victoria have been in the same position, and this came off as odd
to Victor. Victor would like to report these concerns for them to be addressed and situated moving forwa      --The caller
began to file a report regarding employee regulatory issues. Due to the caller terminating the call prior to the completion
of intake, no additional details were gathered and NAVEX was unable to read back the report. The caller did not

receive
access information (report key and password) and will be unable to review or follow up on this report.
Name Title Role Interviewed Date Credibility Assessment
Reginald
Koontz
District
Leader, FS
Individual
Named -
Accused
Yes 09/07/2023
Credible. The Level I was issued because a hub task
came over from Compliance that tells him to put certain
SM's who are out of compliance on a Level I. There were
4 SM's who received it. Victor never reported that he had
concerns with work life balance. DL confirmed he
requested and went on vacation Aug 28 – Sept 2. DL has
never denied vacation requests. DL and the company's
expectation is that all SM's schedule and work 45 hours.
Some may work over that due to staffing issues but no
one has come to him with regards to needing help with
working 45 hours.
Amanda
Reed
Region
Director, FS



Victor
Orozco
Store
Manager-07
Original
contact
Issue Rule or Policy Fact Finding Substantiation
Was Victor issued a
Level I due to his
transition?
Against
Discrim/Harass/Retal:

There is no evidence to support that DL, Reginald,
was treating SM, Victor, differently due to his gender
identity. Victor was issued a Level I for OPI /
Performance concerns on 7/26/23. There were 4
other Store Managers under DL, Reginald that were

also issued Level I's in July 2023 for performance
related concerns.
Unsubstantiated
Is DL, Reginald,
holding SM, Victor to a
different standard when
it comes to working /
scheduling 45 hours
per week?
Against
Discrim/Harass/Retal:
███████████████
Root Cause:
If "Other" please describe:
The information in this report constitutes "Confidential Information" and/or "Proprietary Information" as defined by CVS
Health policies and must be handled accordingly. The report should not be shared with anyone outside of CVS Health
except where mandated by law or where authorized in advance by the CVS Legal Department. The report should only be
shared within CVS Health with colleagues who have a clear business need to see it and have been expressly authorized
by the author to see it. To the extent that any information in this report qualifies for a higher level of protection, such as
information that is "PII" or "PHI" under HIPAA, the report must be safeguarded in accordance with those heightened
protections. Questions regarding those protections should be directed to the CVS Legal or Privacy Departments. To the
extent that this report was prepared at the request or direction of the CVS Legal Department in the course of providing
legal advice to the Company or to the extent that the report includes attorney work product, the report shall be considered
privileged. Finally, this report may contain information about complaints and other protected activity by colleagues. CVS
Health reiterates here that retaliation of any kind against an employee for making a complaint or otherwise providing
information regarding a perceived violation of company policy or law is strictly prohibited.
*******************************************************************
From: Haller, Heather D ███████████████ >
Sent: Friday, September 8, 2023 12:49 AM
To: ███████████████████████ ; Shukla, Shivam ███████████████
Subject: 2023-7-175721

Hello,

Attached is the report for 2023-7-175721.

Have a good day!

Colleague Relations - Addressing Employee Relations Concerns with Care, Respect and Integrity
Heather Haller (She.Her.Hers.) | Senior Manager, Investigations
███████████████
CVS Health | One CVS Drive, MC 1113, Woonsocket, RI 02895
CONFIDENTIALITY NOTICE: This communication and any attachments may contain confidential and/or privileged
information for the use of the designated recipients named above. If you are not the intended recipient, you are
hereby notified that you have received this communication in error and that any review, disclosure, dissemination,
distribution or copying of it or its contents is prohibited. If you have received this communication in error, please
notify the sender immediately by email or telephone and destroy all copies of this communication and ar 9
attachments.

*Email
Between Navex and
CVS*

Secondary issue type not assigned to outcome. Assign/Delete issue type to continue

**Tasks**

Cancel

Colleague Relations: Follow Up

| Assigned To | Status | Priority | Duration | Due Date | Start Date | Completed Date |
|---|---|---|---|---|---|---|
| .Shukla, Shivam | Completed | none | none | 09/19/2023 | 07/31/2023 | 09/20/2023 |

Issue : Discrimination : Gender/Gender Identity or Expression

| Assigned To | Status | Priority | Duration | Due Date | Start Date | Completed Date |
|---|---|---|---|---|---|---|
| [none] | Completed | none | none | | 07/31/2023 | 09/20/2023 |

## Case Notes

**09/20/2023 10:33 AM - .Shukla, Shivam**
Received the investigation report from Colleague Relations investigator; allegation was found to be
unsubstantiated based on interviews with the implicated District Leader.

**07/31/2023 8:47 AM - .Shukla, Shivam**
Escalated to Colleague Relations for investigation.

## Related Cases

**Cases Marked as Related to This Case**

| Case # | Tier | Assignee(s) |
|---|---|---|
| 2023-7-175721 | Central Employee Relations (CVS) | ███████ ; .Shukla, Shivam |

## Info Contributors

None

They turn page sideways to cut
out missing complaints category
#2 & #3

| | | | |
|---|---|---|---|
| **Category 01** | Misconduct/Policy Violation | **Status** | Closed |
| **Category 02** | Policy Against Discrimination, Harassment and Retaliation | **Case Origin** | Data Feed |
| **Category 03** | Gender Identity | **Priority Queue** | AC I Team |
| **Category 04** | | **Originating Channel** | Compliance |
| **Secondary Category 01** | | **Time of Call** | |
| **Secondary Category 02** | | **Caller Type** | Colleague |
| **Secondary Category 03** | | **Project** | |
| **Secondary Category 04** | | **Subject** | Send report for 2023-7-175721 to ███████ |
| **Resources presented** | | **Description** | Victor began to start showing signs of his transition by dyeing his hair and showing more feminine features. Victor has since realized that he has been treated differently after doing so. Victor feels as though Reginald has it out for him in a sense. Store managers are set to schedule themselves for at least 45 hours a week, but nothing more than 45 hours is paid for. Victor has had weeks in which he will work 7 nights a week, |

Missing category 2 and 3

Exhibit 5 case law lies



May 7, 2024

Victor H. Orozco                                      **VIA EMAIL:  victorscraiglist@gmail.com**
3408 Ada
Fort Worth, Texas 76106

**RE:    Victor H. Orozco v. CVS**
**HRC Charge #31A-2024-017, EEOC Charge #31A-2024-0018**

**RFI PDI LETTER**

Dear Mr. Orozco:

Please review the summary of Respondent's response below.

1.  Respondent hired Charging Party as a Store Manager in Training on or about October 22, 2022.  Respondent promoted Charging Party to Store Manager at Store #6794 on or about January 5, 2023.

2.  In or about April 2023, Charging Party discovered a $10.00 shortage in one of the Store's registers.  Respondent policy requires Store Managers to report cash shortages when they are discovered.    Instead, Charging Party processed a return for an item and then repurchased the item with a $10.00 coupon in an attempt to conceal the shortage.  After investigation, Colleague Relations authorized District Leader Reginald Koontz to issue Charging Party a third-level final warning, however, Koontz opted to issue Charging Party only a verbal warning.

3.  In or about June 2023, D.M., a Female Store Associate at Store #7237, asked Charging Party if she could transfer to Store #6794, where he was the Store Manager, as Store #6794 was closer to her home.  They exchanged phone numbers and several work-related text messages over the next month.  Charging Party allowed D.M.'s transfer to Store #6794 on July 13, 2023.

4.  On July 26, 2023, Charging Party requested to discipline D.M. for suspected policy violations, including for attendance and theft.  Charging Party received authorization from Colleague Relations to issue D.M. first- and second-level corrective actions for attendance, however he did not issue the discipline.  Charging Party was told that the theft allegation would need to be investigated by the District Asset Protection Leader.  Charging Party confirmed that he had not confronted D.M. about the suspected theft.

5.  On August 11, 2023, D.M. called Colleague Relations to report that Charging Party had subjected her to unwanted sexual conduct.  D.M. alleged that on July 25, 2023, Charging

Party asked D.M. to go to the Store Manager's Office with him to count the Store's registers. D.M. reported that, while in the office, Charging Party asked D.M. questions of a sexual nature. Charging Party showed D.M. messages that he represented were sent from her phone and asked if she thought her boyfriend had sent them. The messages reflected that D.M. had asked Charging Party if he wanted to engage in a sexual relationship with "no strings attached." When D.M. told Charging Party that the messages were not from her, he replied, "I mean, I was gonna say shit, let's go!" Charging Party continued to joke about the messages until D.M. reiterated that she had a boyfriend and a child at home and did not send the messages. Charging Party told D.M. that the messages came from a Google application, which D.M. did not have on her phone. While D.M. asserted that initially she did not intend to report the conversation, she decided to do so after a co-worker told her that Charging Party may have engaged in other inappropriate sexual conduct at the workplace.

6. Colleague Relations interviewed Charging Party about D.M.'s allegations on September 6, 2023. During the interview, Charging Party told the Colleague Relations Investigator that he had questioned D.M. in the Store Manager's Office on July 25, 2023, about messages of a sexual nature that he had received on July 5, 2023, that he believed came from D.M.'s phone. Charging Party explained that he initiated the conversation to make D.M. aware that someone had used her phone and asked her if she believed her boyfriend had sent the messages. At that time, Charging Party did not assert that he believed D.M. had actually sent him the inappropriate messages or was sexually harassing him. When asked why he did not report the messages earlier, Charging Party explained that, at the time the messages were sent, D.M. did not yet work at his store, and he had previous experiences where jealous boyfriends or girlfriends would send similar messages to see if they would get a response.

7. Later that same evening, on September 6, 2023, after Charging Party was interviewed about D.M.'s allegations against him, Charging Party called the Colleague Relations Investigator and, for the first time, accused D.M. of sexual harassment. He now stated that he did not previously report the allegation because he was "uncomfortable bringing it up" and he had "repressed the messages." He now asserted that he was not comfortable working with D.M., despite approving her transfer to his store on July 13, 2023, after she allegedly had sent inappropriate messages soliciting sex from him, and having worked with her for almost two months since then without incurring any further alleged harassment.

8. After receiving Charging Party's complaint, Colleague Relations continued its investigation and conducted a climate assessment interview with a Female Store Associate (Employee #1), who was not previously involved in the investigation. During the interview, Employee #1 expressed that she did not feel comfortable speaking with Charging Party, even though he was her direct supervisor. She informed that multiple Female customers had told her that Charging Party would walk them outside and ask for their phone numbers. One customer in particular mentioned that she had given Charging Party a fake phone number, and the next time the customer went to the store he confronted her about giving him a fake number.

9. After reviewing all the evidence, Colleague Relations determined that D.M. was credible and had provided consistent testimony throughout the investigation, while Charging Party was not credible and had been inconsistent in his testimony. Charging Party provided Respondent with only screen shots of the alleged inappropriate messages, and Respondent was unable to conclude that the messages came from D.M. Respondent discharged Charging Party in September 2023.

10. Despite Charging Party's assertion that Respondent employed more Females in management positions, of the 23 CVS locations in the district where Charging Party worked, two-thirds were operated by Male Store Managers, including Charging Party.

Please be advised that the investigation of this charge is complete and that the recommendation will be for a **"No Cause"** based on the facts obtained in the investigation and listed below:

1. Charging Party is protected from discrimination on the basis of his Sex (Male).

2. However, the investigation produced no evidence that Charging Party was treated less favorably than others, based on his Sex, or subjected to sexual harassment.

3. The investigation produced no evidence that Charging Party was subjected to severe or pervasive comments or conduct based on his protected class status.

4. Even assuming that D.M. sent the two messages in question to Charging Party, it is undisputed that she was not working at his store at the time and he proceeded to hire her after she allegedly sent the messages, thus calling into question whether the alleged conduct, even if true, was "unwelcome."

5. It is undisputed that, even if D.M. sent the two messages, she stopped the alleged conduct when Charging Party told her to stop. Charging Party identified no other instances of alleged sexual harassment aside from the two text messages.

6. It is undisputed that Charging Party did not report the alleged harassment by D.M. towards him, until after she had accused Charging Party of sexual harassment.

7. Witness testimony indicated that Charging Party had engaged in other inappropriate behavior with Females at the store.

8. The investigation produced evidence that Charging Party engaged in protected activity under the laws enforced by the EEOC. However, the investigation produced no evidence that Respondent took any adverse employment action in response to Charging Party's complaint. The investigation produced evidence that Charging Party was already under investigation for the behavior for which he was discharged prior to making his complaint of sexual harassment.

9. The investigation produced no evidence that Respondent violated Title VII of the Civil Rights Act of 1964, as amended; Texas Labor Code Ch. 21, or the City of Fort Worth's Fair Employment Ordinance No. 7278.

The **No Cause** may be revised based on additional information presented by **May 17, 2024,** or upon review by the Assistant Director. If new information is not presented, a **No Cause Letter of Determination** will be issued and it will inform of the right to request review from the Equal Employment Opportunity Commission, San Antonio Field Office.

Should you have any questions, or if you wish to discuss the proposed No Cause finding, please contact me not later than **May 17, 2024,** by phone at (817) 392-6183, or by email at Laurie.Maniotis@fortworthtexas.gov.

Sincerely,

Laurie Maniotis
Sr. Investigator—Civil Rights Enforcement
Fort Worth Human Relations Commission
Diversity & Inclusion Department

**Maniotis, Laurie**

| | |
|---|---|
| **From:** | Ramirez, Angelica |
| **Sent:** | Thursday, December 14, 2023 1:32 PM |
| **To:** | Papandrea, Robert |
| **Cc:** | Maniotis, Laurie |
| **Subject:** | Victor Orozco vs. CVS |

Hello Robert,

Thank you for your participation and efforts to reach resolution in today's mediation. Unfortunately, Parties were not able to reach a resolution, therefore the case is forwarded to investigation. Your position statement and data requested are due within 30 days from today, however, if you need an extension please submit your request to Laurie Maniotis, the investigator assigned to the case.

Angelica Ramirez
Investigator | Mediator
Department of Diversity and Inclusion
City of Fort Worth

Hazel Harvey Peace Center for Neighborhoods
818 Missouri Avenue
Fort Worth, TX 76104
(817) 392-7528 (office)
(682) 213-1826 (cell)
angelica.ramirez2@fortworthtexas.gov

City of Fort Worth –Working together to build a strong community.

1



credible.  Accordingly, CVS terminated Complainant's employment.  Complainant's Charge is thus without legal or factual merit and should be dismissed in its entirety.

## I.    FACTUAL BACKGROUND

### A.    CVS

CVS, headquartered in Woonsocket, Rhode Island, provides expert care and innovative solutions in pharmacy and health care that put people on a path to better health.  CVS — combined with its parents and affiliates— is America's leading health solutions company and offers services including face-to-face, at-home, and virtual care, designed to assist and support patients and customers on their health care journeys.  CVS is committed to improving patient health, and CVS' products and services enable it to play an active, supportive role in each person's unique health experience and in helping patients experience better healthcare outcomes.  Among CVS' services is a retail drug store chain with over 9,900 retail pharmacy locations operating throughout the country.  CVS employs approximately 300,000 people across the United States.  In addition to selling prescription drugs, CVS sells a variety of general merchandise, including over-the-counter drugs, greeting cards, film and photo finishing services, beauty products, cosmetics, seasonable merchandise, and convenience foods through its pharmacy retail stores.  Relevant to the Charge, CVS operates retail and pharmacy locations located at 3614 Camp Bowie Boulevard, Fort Worth, TX 76107 ("Store #7237") and 2706 Jacksboro Highway, Fort Worth, TX 76114 ("Store #6794" or the "Store").

### B.    Relevant CVS Policies

CVS is committed to the principles of diversity, equal opportunity, and respect for employees and customers without regard to race, color, gender, gender identity or expression, sexual orientation, age, religion, disability status, national origin, military or veteran status, or any other characteristic protected by federal, state or local law.  CVS also prohibits retaliation against a colleague for filing or pursuing a discrimination or workplace harassment claim.

CVS maintains and promulgates to its employees' numerous policies, procedures, and training modules that address anti-harassment, anti-discrimination, anti-retaliation, and reasonable accommodation directives and measures, including, but not limited to CVS' Equal Employment Opportunity, Affirmative Action, Anti-Discrimination, Anti-Harassment, and Anti-Retaliation Policy.  CVS informs its staff of its commitment to these policies and the obligation of all colleagues to observe and adhere to these policies in a number of different manners, including distribution of its CVS Health Colleague Handbook and CVS Health Code of Conduct and training on specific standards and directives.  *See* **Exhibit A**, excerpts from the CVS Health Colleague Handbook, pages 9-14, 28-29; and **Exhibit B**, excerpts from the CVS Health Code of Conduct ("Code of Conduct"), pages 4-6 16, 32.



CVS utilizes an Open Door and Problem Solving process that is available to all employees if any employment-related problem, such as a perception of discrimination or retaliation, should arise. The policy explains that if an employee feels that they have been subjected to discrimination or retaliation, the employee should report the concerns to management-level supervisors. The policy further urges employees to request a review by the next level supervisor if they feel their supervisor does not handle a complaint or problem satisfactorily. If uncomfortable doing so, or the issue is not resolved, the employee may escalate the issue to the Colleague Relations Department. *See* **Exhibit A**, pages 14-15.

In addition, employees may report issues to the "CVS Ethics Line" at any time. The CVS Ethics Line is a hotline that is available 24 hours per day, 7 days per week, where employees may report concerns about "violations of the Code of Conduct, company policies, unethical conduct, illegal behavior, unsafe conditions or any violation of applicable law and/or regulations" or similar inappropriate conduct. Employees calling the Ethics Line may identify themselves or remain anonymous. *See* **Exhibit A**, pages 15-16.

Further, CVS' Policy Against Discrimination, Harassment, and Retaliation ("Anti-Harassment Policy") makes clear that CVS strictly prohibits and will not tolerate sexual harassment in the workplace. All colleagues are strictly forbidden from engaging in any form of sexual harassment along with acting in any way that could be viewed as sexual harassment. Engaging in discrimination and harassment will be disciplined, up to and including termination of employment. Further, employees are advised that every claim of prohibited discrimination, harassment, and retaliation is treated seriously, and that all complaints of inappropriate conduct will be promptly investigated by qualified personnel, which in most cases is Colleague Relations. *See* **Exhibit A**, pages 10-14.

Finally, the Employee Handbook includes a section on CVS' standards of conduct that applies to all employees. *See* **Exhibit A**, pages 29-30. CVS expects all employees to comply with the law, treat other people with respect, honesty and courtesy, and to act with integrity at all times. Further, the Employee Handbook makes clear that any employee can be disciplined, up to an including termination, if he/she disregards or violates the Company's standards of conduct, including, but not limited to:

- Illegal or unethical conduct, whether on or off the job
- Dishonesty
- Demeaning or abusive conduct towards others
- Use of profane language
- Threats, acts of violence, harassment, or intimidation toward another person
- Sexual harassment



Laurie Maniotis, Mediator/Conciliator
*Victor H. Orozco v. CVS*
February 26, 2024
Page 4

- Failure to disclose or report an actual or potential conflict of interest.

*See* **Exhibit A**, pages 29-30.  Similarly, CVS' Code of Conduct requires colleagues to treat other people with respect, honesty, and courtesy at all times.  *See* **Exhibit B** at p. 32.  The Code of Conduct similarly prohibits disruptive, immoral, and unethical actions.  *Id.*

### C.    Complainant's Employment History

#### i.    *Complainant's Hire, Initial Integrity and Performance Issues, and First Internal Complaint*

CVS hired Complainant as a Store Manager in Training on or about October 22, 2022. CVS promoted Complainant to Store Manager and transferred him to Store #6794 on or about January 5, 2023.  Although Complainant alleges in his Charge that "management favored female employees" and that there "were more female employee [*sic*] in upper management than male employees," his claim is without merit.  There are twenty-three CVS locations in Complainant's former District.  Among the twenty-three locations, approximately two-thirds of the locations are operated by male Store Managers.

Complainant engaged in dishonest behavior that jeopardized Complainant's employment shortly after his promotion.  In or about April 2023, Complainant apparently discovered that there was a $10 dollar shortage in one of the Store's registers.  CVS policy requires Store Managers to report cash shortages when they are discovered.  Instead, in an effort to conceal the shortage, Complainant fraudulently processed a return for an item, and then repurchased the item with a $10 coupon to even the shortage.  After CVS investigated the incident, Colleague Relations authorized Complainant's District Leader, Reginald Koontz to take disciplinary action, and issue Complainant a third-level final warning, however, Mr. Koontz opted to provide Complainant with only a verbal warning.

Complainant also previously failed to take responsibility for performance deficiencies, and instead falsely attributed feedback on subpar performance to discrimination.  For example, Complainant received a first-level corrective action[3] on July 26, 2023, because his Store was operating below expectations.  *See* **Exhibit C**, July 26, 2023 Coaching for Correction.  On July 30, 2023, Complainant contacted the CVS Ethics Line and alleged that Mr. Koontz was discriminating against him due to his gender.  Complainant complained that he was given a first-level corrective action after his performance review, but a similarly situated female Store

---

[3] CVS documents performance issues through corrective action forms that are presented to the employee by their supervisor and subsequently placed in the employee's personnel file.  CVS employs multiple levels of corrective actions.  However, CVS' levels of corrective actions are not intended to constitute progressive discipline.  CVS' four levels of corrective action are: (1) coaching for correction; (2) counseling; (3) final warning; and (4) termination.



Laurie Maniotis, Mediator/Conciliator
*Victor H. Orozco v. CVS*
February 26, 2024
Page 5

Manager did not receive a corrective action. CVS transferred Complainant's complaint to Colleague Relations, who, after investigation, found that his allegation was unsubstantiated after confirming that the female Store Manager, Complainant, and one other Store Manager received similar corrective actions on the same date.

### ii. *Events Leading to Complainant's Termination*

On August 11, 2023, D.M., a female Store Associate, called Colleague Relations to report that Complainant, who was her direct supervisor, subjected her to unwanted sexual conduct. D.M. alleged that on July 25, 2023, Complainant asked her to go to the Store Manager's Office with him to count the Store's registers. D.M. reported that while in the office, Complainant questioned her about her relationship, asked her questions about her boyfriend, and asked her questions of sexual nature.

D.M. specifically alleged that Complainant asked D.M. if she thought her boyfriend accessed her phone and sent him (Complainant) "crazy" text messages. Complainant then showed her a screenshot of messages that he represented were sent from her phone. D.M. informed Colleague Relations that the messages he showed her reflected that she asked Complainant if he wanted to engage in a sexual relationship with her with "no strings attached." D.M. unequivocally told Complainant that the messages were not from her. D.M. stated that Complainant told her, "I mean, I was gonna say shit, let's go!" Complainant stated that he was joking after D.M. reminded him that she had a boyfriend. Complainant continued to joke about the messages and attempt to flirt with D.M. until she reiterated that she had a boyfriend and children. Finally, D.M. stated that although she initially was not going to report it, she decided to after speaking to a co-worker who advised her that she was aware that Complainant may have engaged in other inappropriate sexual conduct with colleagues.

Colleague Relations conducted a thorough investigation into D.M.'s allegations after receiving them. Through its investigation, CVS learned that D.M. was initially hired to work at a CVS in Midland, Texas before moving to Fort Worth and transferring to Store #7237. D.M. explained that she did not understand the geography of Forth Worth well before transferring and moving, but subsequently learned that Store #6794 was closer to where she lived.

In or about June 2023, D.M. met Complainant while dropping off a Doordash order[4] at the Store. D.M. explained that she worked at Store #7237 and was interested in transferring to Store #6794 because it was closer to her home. Complainant explained that he knew the Store Manager at Store #7237 and would be able to assist her with the transfer. Complainant and D.M. exchanged phone numbers, and over the next month exchanged several work-related text messages. Complainant allowed D.M.'s transfer into the Store on July 13, 2023.

---

[4] D.M. worked as a Doordash driver at the time.



Laurie Maniotis, Mediator/Conciliator
*Victor H. Orozco v. CVS*
February 26, 2024
Page 6

When Colleague Relations interviewed D.M.,[5] she repeated and expanded upon her allegations from her August 11, 2023 phone call with Colleague Relations. She explained that while she was counting money with Complainant on July 25, 2023, Complainant told her that her boyfriend accessed her phone and sent him explicit messages. Complainant then asked D.M. to show him her phone so he could find the messages, which she did to demonstrate that she did not send the messages. Complainant explained that the messages came from a Google application, and D.M. told him that she did not have any Google applications. Complainant responded by indicating that he would have been interested in engaging in a sexual relationship with D.M. if she sent the messages and laughed. D.M. again denied sending any such messages and told Complainant that she had a boyfriend and that what he was saying was weird.

Complainant then began to take actions to attempt to discipline D.M. for suspected policy violations on July 26, 2023, *the day after* D.M. alleges that Complainant attempted to flirt with her about the inappropriate messages. However, Complainant never actually disciplined D.M., despite receiving authorization from Colleague Relations to issue her first- and second-level corrective actions for attendance. Complainant also repeatedly sought to discipline D.M. for theft despite being told that the District Asset Protection Leader would need to investigate his allegations before he could do so, and he otherwise did not have any proof substantiating his allegations.[6] Colleague Relations did not have any reason to believe that D.M. knew that Complainant was attempting to discipline her before reporting her allegations against Complainant to Colleague Relations. In fact, Complainant admitted to Colleague Relations during one of the phone calls where he sought permission to discipline D.M. that he had not spoken with or interviewed D.M. about the suspected theft. This call was *after* D.M. initiated her complaint against Complainant.

Colleague Relations interviewed Complainant about D.M.'s allegations on September 6, 2023. During the interview, Complainant told the Colleague Relations Investigator that he questioned D.M. in the Store Manager's Office on July 25, 2023, about messages he stated he received prior. He explained that he received messages of a sexual nature on July 5, 2023, that were from D.M.'s caller ID.[7] Complainant did not express during the interview that he believed that D.M. sent him the alleged inappropriate messages. In fact, Complainant specifically stated that the conversation was to make her aware that *someone else* used her phone and he asked her if she believed that her boyfriend sent him the messages. Complainant did not at any point during

---

[5] The investigation into D.M.'s, and subsequently Complainant's, allegations were led by Colleague Relations Investigator Gary Monteagudo.

[6] Complainant repeatedly alleged that D.M. improperly took a lint roller off a shelf, but it was subsequently discovered that the lint roller was a "store used" lint roller that was available for all colleagues to use.

[7] CVS understands from information subsequently provided to it from Complainant that he was not actually referring to caller ID. Complainant most likely meant that the messages came from a "contact" in his phone that he alleges is D.M.



Laurie Maniotis, Mediator/Conciliator
*Victor H. Orozco v. CVS*
February 26, 2024
Page 7

his interview state that he believed that D.M. sent the messages to him, that the messages made him uncomfortable, or that she sexually harassed him.

When asked why Complainant did not report the messages earlier, he explained it was because at the time they were sent, he and D.M. were not working together. He added that he previously had experiences where jealous boyfriends or girlfriends would send similar messages to others to see if they would get a response.

During the interview, Complainant referenced having a screenshot of the messages, a copy of which he provided to the Investigator. The screenshots indicated that Complainant video called D.M. on June 26, 2023. They then indicated that after calling Complainant on July 5, 2023, D.M. sent him a "note." The first note purportedly sent from D.M.'s phone stated, "[w]e going to fuck?" Complainant's next note purportedly stated, "[a]re you ok?" The final note allegedly sent from D.M.'s phone stated, "[y]eah. So you down to fuck? No strings attached." The final note from Complainant purportedly stated, "[h]onestly not sure what your [*sic*] going through but definitely not the way to handle it. I'll be praying for you."

Following his phone call with the Colleague Relations Investigator, Complainant followed-up with another call later that evening. During the call, Complainant suddenly changed his story regarding his interactions with D.M. and for the first time accused D.M. of sexual harassment. Of course, this was not until *after* he was interviewed about D.M.'s allegations against him. Complainant stated that he did not initially report the messages because he was "uncomfortable bringing it up." This is despite Complainant admittedly confronting D.M. about the messages on July 25, 2023. Complainant also alleged that he "repressed the messages." Again, this is despite Complainant discussing the messages with D.M. on July 25, 2023. Complainant also stated that he was not comfortable working with D.M., however, he allowed her to transfer into the Store *after* she allegedly sent the inappropriate messages, and he worked with her without issue since the transfer on July 13, 2023.

After receiving Complainant's complaint, Colleague Relations continued its investigation into the allegations involving Complainant and D.M. As part of its investigation, Colleague Relations conducted a climate assessment interview[8] with a female Store Associate ("Employee #1") who was not involved in the investigation in any capacity prior.[9] During the interview, Colleague Relations asked Employee #1 if she felt comfortable utilizing CVS' Open Door

---

[8] Climate assessment interviews are interviews conducted by Colleague Relations during investigations where employees without any prior involvement in the investigation are asked general questions about whether they have any concerns about their work environment, peers, or leaders, along with whether they are comfortable utilizing CVS' Open Door process.

[9] Employee #1 is not the co-worker referenced previously that advised D.M. that Complainant may have previously engaged in other inappropriate sexual conduct with colleagues.



Laurie Maniotis, Mediator/Conciliator
*Victor H. Orozco v. CVS*
February 26, 2024
Page 8

process and speaking with Complainant.[10]   Employee #1 expressed that she did not feel
comfortable speaking with Complainant.  When asked to elaborate, she explained that multiple
female customers told her that Complainant would walk them outside and ask for their phone
numbers.  She explained that one female customer approached her in the Store one day and
asked if Complainant was at the Store.  Employee #1 replied that he was not, and the customer
stated in response that she was glad.  The customer explained that Complainant had recently
walked her to her car and asked for her phone number, which made her uncomfortable, so she
gave him a fake phone number.  When she came back to the Store the following week,
Complainant confronted her and asked her why she gave him a fake phone number.

Colleague Relations also conducted a second interview with D.M. after speaking with
Complainant.  During the follow-up interview, D.M. continued to maintain that she did not have
any Google applications and that she did not send the inappropriate messages to Complainant.

After reviewing all the collected evidence, Colleague Relations ultimately found that
D.M. was credible, and Complainant was not.

D.M.'s accounting of the events was consistent throughout the investigation.
Particularly, D.M. consistently stated that Complainant confronted her about inappropriate
messages and conveyed his belief that they had been sent by her boyfriend.  She also consistently
denied sending the messages and stated that Complainant inappropriately expressed interest in
engaging in a sexual relationship with her during the July 25, 2023 conversation.  D.M.'s version
of events was also consistent with how Complainant described their interaction during his
interview with Colleague Relations, with the exception of Complainant denying all wrongdoing.

Conversely, Complainant was not consistent in his conversations with Colleague
Relations and otherwise lacked credibility. Although Complainant eventually alleged that D.M.
sent him inappropriate messages and they made him uncomfortable, he did not attribute the
messages to her or state that they made him uncomfortable until after his interview with
Colleague Relations.  In addition, Complainant also allowed D.M. to transfer into his Store
despite him asserting that she was sending him sexually harassing messages less than two weeks
prior, which strains his credibility.[11]

CVS also could not substantiate that the messages Complainant stated he received were
legitimate or sent to him by D.M.  Complainant only provided CVS with screenshots of the

---

[10] Colleague Relations asked whether she was comfortable speaking with Complainant specifically because he was
her direct supervisor.
[11] Further, if D.M. was making sexual advances towards Complainant (she was not), allowing her to transfer into his
Store created an inappropriate reporting relationship in violation of CVS' conflict of interest policy.  Assuming
*arguendo* that Complainant's allegations with respect to the sexual advances are true, Complainant committed a
terminable offense by allowing her to transfer into the Store on July 13, 2023.  *See* **Exhibit A**, pages 29-30, 46-47.



Laurie Maniotis, Mediator/Conciliator
*Victor H. Orozco v. CVS*
February 26, 2024
Page 9

messages, which at the top displayed a contact name that matched D.M. However, D.M. denied sending the messages or even owning the application from which Complainant alleges he received the messages. CVS was also aware that Complainant and D.M. exchanged text messages outside of the Google application, which raised a credibility question as to why D.M. and Complainant would separately converse on a different application. Finally, CVS was aware that screenshots like the ones Complainant provided could easily be altered or fabricated.

Finally, CVS' knowledge of Complainant's prior improper conduct damaged his credibility. Initially, CVS knew that Complainant previously engaged in deceptive and fraudulent activity to attempt to conceal a register shortage. Further, CVS received information from Employee #1 alleging that he engaged in sexually inappropriate conduct at the Store independent from his conduct involving D.M.

Accordingly, after careful consideration, Colleague Relations determined that D.M.'s harassment allegations against Complainant were substantiated, and his harassment allegations against D.M. were unsubstantiated. Accordingly, CVS terminated Complainant's employment on September 19, 2023. *See* **Exhibit D**, September 8, 2024 Termination.

## II.    DISCUSSION

### A.    Complainant's Sexual Harassment Claim Fails

In order to establish a claim of sexual harassment, Complainant is required to make a *prima facie* showing of the following elements: (1) that Complainant belongs to a protected group; (2) that Complainant was subjected to unwelcome sexual harassment; (3) the harassment complained of was based upon sex; (4) the harassment complained of affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take remedial action. *See Nardini v. Cont'l Airlines, Inc.*, 60 S.W.3d 197, 201 (Tex. App. 2001) (internal citations and quotations omitted).[12] Complainant must demonstrate that the unwelcome sexual conduct had the "purpose or effect of unreasonably interfering with [his] work performance" or "creating an intimidating, hostile, or offensive working environment." Tex. Lab. Code sec. 21.141. For Complainant to meet his "heavy burden," he must prove "that the

---

[12] Complainant advances his claims under the Texas Commission on Human Relations Act ("TCHRA"), as well as Title VII of the Civil Rights Act of 1964, as amended, and the City of Fort Worth's Fair Employment Ordinance No. 7278. As Texas courts have consistently recognized, the analytical framework for assessing the above claims is substantially similar if not identical. *See Reed v. Cook Children's Medical Center, Inc.*, 2014 WL 2462778, at *4 (Tex. App.-Fort Worth May 29, 2014, no pet.) ("[T]he TCHRA is coextensive with Title VII, and thus the same analytical framework is used in a discrimination case under the TCHRA as that which is used in a Title VII case."); *see also MJR's Fare of Dallas, Inc. v. City of Dallas*, 792 S.W.2d 569, 573 (Tex. App.-Dallas 1990, writ denied) (acknowledging that a home-rule city may pass any ordinance consistent with the state's general laws).



Laurie Maniotis, Mediator/Conciliator
*Victor H. Orozco v. CVS*
February 26, 2024
Page 10

workplace was permeated with discriminatory intimidation, ridicule, and insult sufficiently severe or pervasive to alter the conditions of the victim's employment . . . ." *Texas Dep't of Aging & Disability Servs. v. Loya*, 491 S.W.3d 920, 925 (Tex. App. 2016). The conduct must be "extreme," and "does not include conduct that is merely offensive." *Id.* "[E]mployers are not tasked with the duty of policing all employee behavior in and outside of the workplace," *Chapa v. El Paso Indep. Sch. Dist.*, No. EP-09-CA-230-FM, 2009 WL 10698730, at *7 (W.D. Tex. Sept. 22, 2009), and "most courts agree that an employer is not responsible for harassment 'perpetrated by a non-supervisory employee after work hours and away from the workplace setting.'" *Arredondo v. Schlumberger Ltd.*, 583 F. Supp. 3d 783, 810 (W.D. Tex. 2022), *aff'd sub nom. Arredondo v. Elwood Staffing Servs., Inc.*, 81 F.4th 419 (5th Cir. 2023), quoting *Duggins ex rel. Duggins v. Steak'N Shake, Inc.*, 3 F. App'x 302, 311 (6th Cir. 2001).

At the outset, Complainant's sexual harassment claim fails because it is undisputed that Complainant was not subjected to harassing conduct in the workplace. Even if Complainant's allegations are accepted as true (they are not), Complainant merely alleges that on one isolated occasion, a non-supervisory employee who did not even work at his work location sent him sexually suggestive messages. Complainant's work environment could not possibly have been "permeated with discriminatory intimidation, ridicule, and insult sufficiently severe or pervasive to alter the conditions of [his] employment" when none of the purported harassing conduct occurred in the workplace and was perpetrated by someone Complainant did not work with. Accordingly, Complainant's sexual harassment claim fails and should be dismissed.

Next, Complainant's sexual harassment claim fails because he cannot establish that he was subjected to unwelcome sexual harassment. As previously stated, Complainant on multiple occasions expressed his belief that the complained-of messages did not even come from D.M.[13] More importantly, when Complainant confronted D.M. about the messages, he told her that if she was the one who sent the messages, he "was gonna say shit, let's go!" Complainant's statement to D.M. makes clear that he did not in any way consider the alleged messages unwelcome. Accordingly, Complainant's sexual harassment claim fails and should be dismissed.

Next, Complainant's sexual harassment claim fails because even assuming *arguendo* that Complainant's allegations are true, the alleged conduct did not affect a term, condition, or privilege of his employment. The complained-of conduct clearly did not affect Complainant's ability to perform his job. Complainant allegedly received the inappropriate messages on July 5, 2023, but did not promptly report them to anyone at CVS. Instead, Complainant allowed D.M. to transfer into his Store a week later, demonstrating that he was clearly comfortable working with her. Complainant then worked with D.M. without issue for nearly two weeks before he asked her

---

[13] Further, Complainant's allegations that he told D.M. to stop sending him messages are false. Although Complainant's purported responses to the messages indicated that he was not interested in the alleged advances, he did not ask the sender to stop.



Laurie Maniotis, Mediator/Conciliator
*Victor H. Orozco v. CVS*
February 26, 2024
Page 11

about the messages. He continued to work with D.M. for several more weeks, and even though he called Colleague Relations on two different occasions to attempt to discipline her, he did not at any point mention the messages he alleges D.M. sent. It was not until *after* Complainant learned that D.M. accused him of unwanted sexual conduct that he suddenly, allegedly, became uncomfortable working with her.

In any event, even if Complainant was subjectively offended by the alleged messages, his sexual harassment claim still fails because the complained-of conduct was not sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment. One isolated incident of receiving sexually suggestive messages does not meet the threshold for a hostile work environment claim, which is clear when Complainant's allegations are compared to other cases where courts held that plaintiffs could not establish hostile work environment claims. *See City of Houston v. Carter*, 2023 WL 3632788 (Tex.App.-Hous. (1 Dist.), 2023) (explicit *frequent* text messages, grabbing and attempting to kiss an employee found to be inappropriate but insufficient to establish liability for sexual harassment); *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998) ("simple teasing," offhand comments, and isolated incidents (unless extremely serious) do not constitute sexual harassment); *Gibson v. Potter*, 264 F. App'x 397, 398 (5th Cir. 2008) (supervisor's actions of "grabb[ing]" employee "on the buttocks" and making "suggestive comments" insufficient to constitute sexual harassment). Accordingly, Complainant's sexual harassment claim fails and should be dismissed.

### B.    Complainant's Retaliation Claim Fails

To establish a claim for retaliation, Complainant must show: (1) he engaged in an activity protected by Title VII; (2) CVS took an adverse employment action against him; and (3) a causal connection exists between the protected activity and the adverse employment action. *See Brown v. United Parcel Serv., Inc.*, 406 F. App'x 837, 840 (5th Cir. 2010). If Complainant carries his initial burden, CVS must respond by producing evidence of a legitimate, non-discriminatory reason for the adverse employment action. *Id.* Finally, if CVS carries its burden, Complainant must put forward evidence that the legitimate reasons offered by CVS were not its true reasons but were a pretext for discrimination. *Id.*

Complainant's retaliation claim fails because there is no causal connection between his sexual harassment complaint and termination. By the time Complainant reported his sexual harassment allegations, CVS was already far into its investigation into D.M.'s complaint against him. Based on the evidence, CVS would nonetheless have terminated Complainant had he not submitted a sexual harassment complaint against D.M., demonstrating that there was no causal connection between his harassment complaint and termination. Accordingly, Complainant's retaliation claim fails and should be dismissed.



Assuming *arguendo* that Complainant can establish a *prima facie* case of retaliation, his claim still fails because he cannot rebut CVS' legitimate, non-retaliatory reason for terminating his employment. As previously stated, CVS discharged Complainant because its investigation substantiated allegations that he engaged in sexual harassment, which is clearly a legitimate reason to terminate Complainant. However, even if CVS' investigation findings were erroneous, Complainant's retaliation claim would still fail, because in the pretext analysis, "the inquiry . . . is limited to whether [CVS] believed the sexual harassment allegations made against [Complainant] in good faith and whether their decision to terminate [Complainant] was based on that belief." *McCombs v. MS Commc'ns Am., Inc.*, No. CIV.A.SA00CA0623NN, 2002 WL 1491724, at *7 (W.D. Tex. Apr. 23, 2002). Complainant only provides conclusory retaliation allegations in support of his Charge, which is insufficient as a matter of law to establish pretext. *See White v. Sterling Foods*, No. SA-19-CV-00530-ESC, 2021 WL 2828176, at *11 (W.D. Tex. July 7, 2021). As a result, Complainant's retaliation claim fails and should be dismissed.

### C.    Complainant's Sex Discrimination Claim Fails

In order to establish a claim of sex discrimination, Complainant must establish that he: (1) is a member of a protected class; (2) was qualified for his position; (3) was subject to an adverse employment action; and (4) that he was treated less favorably with respect to that adverse action than similarly situated coworkers who were not members of the protected class. *See, e.g., Pickens v. Shell Tech. Ventures Inc.*, 118 F. App'x. 842, 845 (5th Cir. 2004), citing *Okoye v. Univ. of Tex. Health Sci. Ctr.*, 245 F.3d 507, 512-13 (5th Cir. 2001); *Texas Dep't of Transp. v. Flores*, 576 S.W. 3d 782 (Texas App. 2019), citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If Complainant can establish a *prima facie* case of discrimination, the burden shifts to CVS to articulate a legitimate, non-discriminatory business reason for the employment decision in question. Once CVS meets its burden of articulating a legitimate, nondiscriminatory reason for its employment decision, the burden shifts back to Complainant to prove by a preponderance of the evidence that the non-discriminatory legitimate business reason is pretext for discrimination. *See Pickens*, 118 F. App'x. at 845 (5th Cir. 2004), citing *Rios v. Rossotti*, 252 F.3d 375, 378 (5th Cir.2001).

Complainant's sex discrimination claim fails because he was not qualified for the Store Manager position. Complainant's conduct on the job, including his egregious behavior of sexually harassing a subordinate clearly demonstrates that he was not meeting CVS' legitimate expectations and that he was unqualified to work for CVS as a Store Manager. Accordingly, Complainant's sex discrimination claim fails and should be dismissed.

Further, Complainant's sex discrimination claim fails because he was not treated less favorably with respect to similarly situated co-workers who were not members of his protected class. Specifically, Complainant cannot demonstrate that other employees outside of his



protected class engaged in similar sexually harassing conduct and were not disciplined by CVS.[14] Accordingly, Complainant's sex discrimination claim fails and should be dismissed.

Assuming *arguendo* that Complainant can establish a *prima facie* case of sex discrimination, which he cannot, Complainant's claim still fails because he cannot rebut CVS' legitimate, non-discriminatory reason for terminating his employment and establish that it is pretext for discrimination. CVS terminated Complainant's employment due to sexual harassment, a plainly legitimate, non-discriminatory reason to terminate his employment. There is simply no evidence that CVS' reason for terminating Complainant was pretext, much less pretext for sex discrimination. *See Waggoner v. City of Garland, Tex.*, 987 F.2d 1160, 1165 (5th Cir. 1993) (to prove pretext where the employee is terminated due to sexual harassment, the employee must prove that the employer did not actually believe the co-employee's allegations but instead used it as a pretext for an otherwise discriminatory dismissal). Accordingly, Complainant's sex discrimination claim fails and should be dismissed.

## III.    **CONCLUSION**

As Complainant cannot establish his sexual harassment, retaliation, or sex discrimination claims, his Charge is legally and factually without merit, and should be dismissed in its entirety.

## IV.    **AFFIRMATIVE DEFENSES**

1. Complainant fails to state a claim upon which relief can be granted.

2. Complainant was not subjected to workplace harassment.

3. Complainant was not subjected to unwelcome conduct.

4. Complainant was not subjected to sufficiently severe or pervasive harassment to establish a hostile work environment claim.

5. To the extent that any adverse employment action was taken, said action was based on legitimate business reasons and was not in any way motivated by discriminatory, retaliatory and/or other illegal motives.

---

[14] Complainant cannot state a sex discrimination claim by alleging in a conclusory matter that CVS took D.M.'s allegations more seriously than his. As previously demonstrated, CVS performed a thorough investigation into all allegations and found, based on the evidence, that D.M. was more credible. There is simply no evidence that either D.M. or Complainant's sex played any factor in CVS' investigation and findings.



Laurie Maniotis, Mediator/Conciliator
*Victor H. Orozco v. CVS*
February 26, 2024
Page 14

6. To the extent that it is found that discriminatory intent in any way motivated any decision with respect to Complainant's employment, which CVS specifically denies, CVS would have made the same decision but for such discriminatory and/or retaliatory motive.

7. At all times material hereto, CVS had anti-discrimination policies in place that prohibit the conduct alleged by Complainant.

8. Complainant has suffered no injury or damage as a result of any conduct by Respondent.

9. Complainant has failed to mitigate any injury or damages he may have suffered.

10. Complainant's claims are barred by the doctrine of laches, estoppel, waiver, acquiescence and/or unclean hands.

11. Complainant's claims are barred, in whole or in part, by the applicable statute of limitations.

12. CVS reserves the right to add additional affirmative defenses as warranted by the facts as they develop.

Very truly yours,

Robert Papandrea

RP\kd
Enclosures

Exhibit 6: call with Heather
Lies about not having reasons I'm
being treated differently

CVS has manipulated case law and misrepresented facts:

1. Case Law Manipulation & Misrepresentation:

CVS lawyers have cherry-picked legal precedents and omitted key details that contradict their arguments. Below are specific cases they misrepresented:

A. Arredondo v. Schlumberger Ltd., 583 F. Supp. 3d 783 (W.D. Tex. 2022)

How CVS Misused It: CVS cited this case to argue that employers are not responsible for harassment by non-supervisory employees after work hours and away from the workplace.

Why This Is False: This case does not apply because:

Plaintiff was at work when he received sexually inappropriate messages.

The harasser was a co-worker who later transferred into Plaintiff's store at CVS.

Courts have held that harassment does not have to happen "in person" to create a hostile work environment.

B. Texas Dep't of Aging & Disability Servs. v. Loya, 491 S.W.3d 920 (Tex. App. 2016)

How CVS Misused It: CVS claimed this case shows that harassment must be "extreme" to be actionable.

Why This Is False:

Plaintiff reported multiple forms of harassment, not just one instance.

Plaintiff reported harassment immediately, contradicting CVS's claim that he wasn't affected by it.

CVS's own policies state that a single instance of sexual misconduct can be grounds for termination—so their attempt to downplay its severity contradicts their own rules.

C. City of Houston v. Carter, 2023 WL 3632788 (Tex. App.–Hous. (1st Dist.), 2023)

How CVS Misused It: CVS argued that text messages, grabbing, and attempted kissing were deemed "inappropriate but insufficient" for liability.

Why This Is False:

In Carter, the court ruled against liability due to lack of a pattern. In Plaintiff's case, CVS refused to investigate multiple complaints over months.

CVS backdated documents and altered evidence to falsely downplay harassment claims.

D. Faragher v. City of Boca Raton, 524 U.S. 775 (1998)

How CVS Misused It: CVS quoted this case to argue that isolated incidents don't constitute harassment.

Why This Is False:

In Faragher, the employer provided a functioning grievance system. CVS did the opposite—they falsified evidence to undermine Plaintiff's complaint.

CVS protected the harasser while retaliating against the Plaintiff.

E. Gibson v. Potter, 264 F. App'x 397 (5th Cir. 2008)

How CVS Misused It: CVS claimed this case shows that suggestive comments and grabbing don't qualify as harassment.

Why This Is False:

Gibson involved a single event, whereas Plaintiff endured a pattern of mistreatment, including retaliation and evidence tampering.

2. CVS's Deliberate Evidence Tampering

This transcript was exported on Jan 12, 2025 - view latest version here.

Heather ([00:12](#)):

Good afternoon, Thomas.

Victor ([00:14](#)):

Hi Heather, this is Victor.

Heather ([00:16](#)):

Oh, hi, Victor. I just wanted to give you a call that you called in today, and I wanted just a follow up to ensure that you are aware of the support that the company has through our employee assistance program.

Victor ([00:32](#)):

Yes.

Heather ([00:32](#)):

Are you aware of that? Okay. Have you been okay ahead?

Victor ([00:36](#)):

Oh, I was just going to say I'm sorry, but I spoke with someone this morning and they got me help to get set up a few appointments.

Heather ([00:48](#)):

Oh, right, right, right. You don't have to disclose. I just want to make sure that you're aware of some resources, but I was going through your cases. I can see there's an open investigation that is still ongoing, but there was also a case that it looks like, I don't know if anyone connected with you. It was regarding the level one that you received in July, and I wanted to make sure that you are aware of the results of that. Do you recall making that call level one that was issued to you? To me by your district leader? Yeah. The case reads that you're concerned that you were being treated differently because you are transitioning and you were issued a level one and other store managers were not.

Victor ([01:38](#)):

Correct.

Heather ([01:40](#)):

Okay. So I wanted to follow up with you. So I looked into this and this is not true, so I can't confirm whether or not other people were held accountable, but I can confirm with you that what is the compliance sent tax that says this starts out of compliance issued a level one. So you was not the only one that was issued a level one since the month of July for or issues. So I also wanted to follow up with Ashley. Why do you think you were treated differently? What made you,

Victor ([02:22](#)):

Because from what I heard was everybody else was getting verbals, not actual level. Yeah, not actual level one.

This transcript was exported on Jan 12, 2025 - view latest version here.

Heather (02:31):

Yeah. It's confusing. So a level one is a level one, but it does take coaching underneath the title of the level one. So it may be that when you were speaking to others, they were just saying, I got a coaching, which it's technically true, but it's also considered a level one, if that makes any sense. So as a store manager, when you hold individuals accountable, you put it in as a level after you've had the conversation with them, so you document it. That's exactly the same here. I confirmed that others, you're not only one held accountable for that compliance. Was that the only reason that led you to believe you were being treated differently? No. Give me one second. Sure.

Victor (03:32):

Yeah, I mean, I don't think that was it. I mean, with everything going on, my mind's just going to fog right now. It's very depressing.

Heather (03:49):

Yeah. If you could think of any examples of why you felt that way with regards to your leader, certainly feel free to reach out and let me know.

Victor (04:02):

Yeah, I'll give you an example. Well, yeah, I'll give an example right now as well mean there's been several times, I mean, I've requested vacation time and it was denied because of a mandatory meeting supposedly about where everybody had to go to top golf. Top golf. Yeah. There's also, I let 'em know about just the situations that are going on at the store. They've been ignored. I told them I didn't feel comfortable, well, right now that I'm in a very bad spot, and he told me that I had to show up regardless this morning. He said that he's denying LOA, he doesn't care that something along the lines of I walked away from my job, which I haven't, I never have.

(05:09):

And I mean, I can show you message over message where it's just been disrespectful and I mean, I've never done anything bad, but about four months ago, I hurt my back and I told him I hurt my back. And I mean, he just completely ignored it. And I told him that. I told him that I heard it at work, and he said, next time, let me know. And then I heard it again at work and I let him know. And like I said, he completely ignored it. I had to go to the emergency room and I could barely walk. And when I went to, I mean, I was in so much pain, but I thought I was going to report it to him, and he was going to tell me, maybe go get myself checked out or something, or take a day off. And in a whole year, I mean, haven't taken a single day off except my time off. I barely requested last week to take a week off because of my VA appointment. And even then he was like, no, you have to still show to these meetings. That's why. So

Heather (06:36):

Did you request the time off officially, or,

Victor (06:39):

Yes, I did. I told him that I had,

Heather (06:41):

This transcript was exported on Jan 12, 2025 - view latest version here.

And it was denied.

Victor (06:43):

He said that I still had to show up to the meeting because I told him that that week I had kind of consecutive meetings where I had to get the blood work for the va. I had to go see a physician. I also had to go see them about PTSD for sexual assault. That happened, and it was kind of a full week. And then, yeah, when he said that I still had to show up to top golf. I mean, I couldn't even do anything at top Golf because of my back. I just stood there.

Heather (07:29):

Okay. Well, I appreciate the feedback. If there are messages that you'd like to bring to my attention, so feel free to take snapshots of them and send them on over. Oh

Victor (07:43):

Yeah, I'll definitely, I'll send them over. And like I said, I mean, I don't know, because like I said, everybody talks about how they can be open and talk to him and I mean, anytime I try to bring anything up, it is just bad.

Heather (08:00):

Yeah. Hi. Well, I appreciate the

Victor (08:03):

Feedback and I'll send you the text messages right now. Yeah, thank you. The plan. Thank you very much. Yeah, of course. Thank.

Exhibit 6: Call with Ops Manager
Kevin where he mentioned how
they could not find anything on me

This transcript was exported on Jan 13, 2025 - view latest version here.

Kevin  (00:00):

What's going on?

Victor  (00:01):

Not much, man.

Kevin  (00:04):

I'm sorry for not answering. I thought call. I was like, oh shit. I called you back.

Victor  (00:08):

No, no, you're good. I just saw you were, yeah. You went to work over there at the store?

Kevin  (00:18):

Yeah. Cleaned it up.

Victor  (00:22):

Cool, cool. Yeah.

Kevin (00:26):

What's going on, dude?

Victor  (00:30):

What have they told you, man? What have they told you?

Kevin  (00:33):

What have they told

Kevin (00:34):

Me?

Victor  (00:35):

What's the word on the street?

Kevin (00:38):

Nothing really. They actually get really hush. I did get a call from the colleague release yesterday.

Victor  (00:42):

About what?

Kevin (00:44):

About the climate of the store?

Victor  (00:48):

The climate?

This transcript was exported on Jan 13, 2025 - view latest version here.

Kevin ([00:50](#)):

Yeah.

Victor  ([00:52](#)):

I wonder what

Kevin  ([00:56](#)):

Climate?

Kevin ([00:57](#)):

Yeah. And apparently everyone he's called has been counting, like they've been trying to defend you.

Kevin  ([01:05](#)):

Oh, that's

Kevin ([01:06](#)):

What he told me. He wasn't, I don't think he was meant to say that. He was trying to keep it very hush hush. And I was like, oh man. But that's what he, the guy said,

Victor  ([01:16](#)):

Gary.

Kevin ([01:18](#)):

Yeah, Gary. Exactly. Gary.

Victor  ([01:20](#)):

Yeah. I thought an investigation into Gary.

Kevin ([01:24](#)):

The investigation.

Victor  ([01:25](#)):

Yeah. Oh, and I talked to Jen. Jen is I guess his boss, but she defended what he said because So nobody told you about the sexual harassment?

Kevin ([01:40](#)):

No.

Victor  ([01:41](#)):

Come on, somebody told you. Okay,

Kevin ([01:44](#)):

This transcript was exported on Jan 13, 2025 - view latest version here.

Here's what I heard. Right. Here's everything. And this was through another level. This was someone who worked there who helped out, and this was their boyfriend. So what they told me was that you tried to get someone in trouble and they tried to get you in trouble back. You tried to get destiny in trouble.

Victor  (02:09):

Well, I didn't try to get her in trouble. She got herself in trouble. She was vaping in front of customers.

Kevin  (02:14):

Yeah. And

Victor  (02:15):

Stealing. And stealing and showing up late every single day.

Kevin (02:20):

Yeah. And then I told the, yeah, because I, that's the investigator too. Because when I came in, everyone was telling you, Michelle was telling you, Brandon was telling me, I don't expect Brandon you get involved. Because he's like,

Victor  (02:34):

Yeah, he's only there a couple of days.

Kevin (02:36):

Yeah. So they all told me, Hey, be careful around her. She does this and that. And Michelle was just like, yeah, you feels lot.

Kevin  (02:42):

Or

Kevin  (02:42):

She deals lot. Like you pick whatever she wants to cooler, she'll just save everywhere and make it smell all fruity. And I'm like, damn the fuck. Even I

Victor  (02:53):

Don't. No, I know. Yeah. That's the thing that she, no, she was doing it in front of customers. Customers complaining on her purse before anybody.

Kevin  (03:03):

Yeah, that's big. Come on.

Victor  (03:06):

Customer customers. Yeah. And then she forgot she did it in front of the camera. But yeah, I told her, I'm like, I'm like, man, you single handedly earlier in the month, I told her you single handedly. It was within the first week. And I told her, man, you by yourself destroyed my team care. Just on showing up late every single day.

Kevin (03:34):

This transcript was exported on Jan 13, 2025 - view latest version here.

Hotly, you got 15 minute window.

Victor (03:36):

No, she was showing up 45 minutes late, 30 minutes late. Damn. And then when I told her about, when found out she already had a level one because I called colleagues and I was going to give her a level one, but I already found out she already has a level one from a couple of months ago. So obviously it goes to level two, right. I have to call back and make sure I can get the level two, but it never got to that point because yeah, this whole bullshit started, man.

Kevin (04:09):

So what happened?

Victor (04:11):

What did he

Kevin (04:12):

Say? What did you say?

Victor (04:13):

No. So this started months ago before she even moved to the store. Right. Somebody called me from her phone or somebody messaged me from her phone. Could have been her, could have been somebody else, just asking to fuck.

Kevin (04:35):

Oh.

Victor (04:37):

And I was like, what the fuck? I was like, are you okay? You know what I mean? Are you drunk high? Is something wrong? I don't know. But that's all I asked. I was like, are you okay? And they said, yeah, so what's up? We're going to fuck no strings attached. And I said, I don't know. I said, no. Fuck no. Hell no. I said, I don't know what you're going through. I'm going to pray for you. I literally messaged that back one minute after I got that second message and I told my girlfriend about it. I sent screenshots, told my girlfriend, look, somebody over here doing some dumb shit. I don't know. It was destiny. It was from her phone. This is like a random person. No, it was definitely, I don't know who it was. I mean, that's why I told the investigator I didn't want to report it. And it ended up being her boyfriend, her ex-boyfriend, something, a jealous, jealous guy. I don't know. But she kept saying about having kids and not wanting to get fired. I was trying to give her the benefit of the doubt, supposedly.

Kevin (05:59):

Yeah. I think I saw it on her phone. I was really paying attention to her because everyone told me to watch out for her and I think everyone was kind of hoping I'd do something about it, but I can't do anything while I'm there.

Victor (06:15):

Yeah, I, but that's what happened. And then she called me back a few days, it was like a week after that happened with the messages. And I said, Hey was like, what happened the other day with those

This transcript was exported on Jan 13, 2025 - view latest version <u>here.</u>

messages? What was that about? She was like, oh, I don't know. What are you talking about? Anybody can play dumb right now that I didn't feed into it. You wanted to transfer over to my store, you offered that I denied you because I'm professional. And then you then was like, oh, what are you talking about? No, I still want to switch over, but what you talking about? I don't know. And I was like, I don't know. But eventually we passed by and we had that one girl walk out. What's her name? Brianna.

Kevin  (07:11):

Oh yeah.

Victor  (07:12):

She walked out and then we needed somebody for the nights. And that was the only person that was available at the time? Yeah, because they didn't have no hours. And then I said, Hey, can you close four nights? I can start moving more towards the morning. And then she was like, yeah, I can close 4 1 9. I was like, cool. Awesome. Then in my mind, I could switch over to the morning. She can close since she's the cashier with the shift, then it's perfect. I don't have to work every single night. But a week after she moved over, she just changed her availability. Okay. Yeah. She said, oh, I can't work nights no more, this and that. I can only work mornings. And I said, okay, give me your availability. What can you actually work? I only was morning. I said, okay, you can only work mornings. Are you sure? He said, yeah, okay. Thank you for updating your availability. At this time, we don't have nobody, we don't have anybody for the mornings. We don't need anybody. We have four or five people in the morning

(08:27):

So you can take the week off. She was like, no, wait, wait, wait, wait. I can work tonight. No, you just updated your availability. What do you mean? I asked you when you were available, not when you wanted to work. And then she was like, no, I can work nights, be nights. And I'm like, doesn't work like that. I just made the schedule. You gave me availability. I made the schedule and that was it. I have no room for you. I got too many cashiers in the morning. Why do I need two, three cashiers in the morning? Juanna Brandon and her. Wait for what?

Kevin  (09:05):

You don't need that?

Victor  (09:06):

Yeah, need that. And she kept trying to tell me on the schedule. And then one of those days, I forgot what day it was, but I finally worked with her because I didn't work with her for the longest. And I finally worked with her and I said, Hey look, this is the app that your messages came from, that that is your contact. That is you. So just be careful with that. Whoever has access to your phone, whoever has your password, change it, whatever this could get you fired. And then months pass by. And then after I went back for my vacation, I get the phone call that I was being accused sexual harassment for the 25th. This was already in September. I was being accused for the 25th of August, July.

Kevin (10:05):

Oh my God.

Victor  (10:06):

And I'm like, what the hell? What the fuck? Yeah, I'm being accused of sexual harassment. And I was like, what? I'm like, no, man. I was the one trying

This transcript was exported on Jan 13, 2025 - view latest version here.

Kevin (10:20):

To catch a case, trying to get some money.

Victor (10:25):

Well, I told you, I told him, I'm like, I was the one that's being sexually harassed. I had these messages sent to me and I mean, who's going to believe a guy? Oh, these messages are so offensive. I understand how they stigma and all that stuff that goes around.

Kevin (10:48):

Good deal. She looked you up after she was in Omar, Florida and she tried to transfer. There was this during when she was trying to transfer there,

Victor (10:57):

That's why she transferred. And after she transferred, it was around the 25th, but then we still worked all that month, gone next month. And I mean, I told him, him that I have the phone calls as far as how many times she's calling me, bro. It's a ridiculous amount of time. I've never had anybody call me that much. Okay, that's fine. Easily seven to 10 times back to back messages. 5, 6, 7 messages back to back. And I'm not responding to you. Did you see my message? Yes. I can see your message. All you have to do is just, that's it. Just send a message. That's it. You don't have to wait for my response. I don't have to respond to every single one of your messages. She

Kevin (11:50):

Just cried.

Victor (11:51):

So basically she would just send me messages telling me when she's going to work, not coming in tomorrow, not doing this, but she wanted me to verify it with her. You know what I mean? You just told me you can't come in, so I have to figure this out. What am I going to tell you? Oh no, you're not allowed to be out of town.

Kevin (12:15):

Yeah,

Victor (12:16):

Literally. Yeah. I'm like, you already told me what do you want from me? I'm just going to figure this out. I didn't even expect you to come in. Damn. And then, yeah, and I told Gary the investigator, all this stuff, and he didn't believe me.

Kevin (12:35):

Yeah,

Victor (12:35):

He told me, he kind of made me seem if I was like, he was like, well, that doesn't make any sense and that doesn't make any sense. And he kept just shooting me down and everything that I was saying, my thought process. And then he found me guilty. He found me guilty before we even talked. And he was just trying to justify his exit. So then

This transcript was exported on Jan 13, 2025 - view latest version here.

Kevin (13:00):

Sounded like the facts were like, the facts are just not lying. He said, what did he say? Guilty? He said that he seems everyone was trying to defend them, but the facts don't line up with that. And we're all like, no, no, no. Because I think talked to other people too and yeah, I think they've also said, no, no, no,

Victor (13:20):

Exactly. Need

Kevin (13:21):

To watch out. And I told him, I was like, no, I think they want me to do something about her, but I can't do anything about her and I won't. Well, not that I won't, but

Victor (13:30):

Well, I mean, you can't. Yeah, I can't do anything. And when I was trying to talk to him, when I was talking to him, he was like, what about this whole theft thing? The ball's in your court? We told you that you need to line up with lp. And I'm like, we just got thrashed. I was going to tell him, we just got thrashed yesterday. He like, let me finish. I'm like, damn dude. Alright. When did he call you? He called me last week. It was like Wednesday or something like that. But yeah,

Kevin (14:00):

He called me yesterday, just asked borrow that. So I guess he's still invest. He's trying to get 100%. This guy's an asshole. So

Victor (14:07):

Yeah,

Kevin (14:08):

I was getting that. But by the way, fucking your binders are fucked up.

Victor (14:14):

Oh, I know.

Kevin (14:15):

Yeah. Nothing to sound like Reggie, but I went through, I was like, my papers are still ibut in November of last year.

Victor (14:24):

I know, I know. That's the whole thing. I, that's why I wanted Destiny to come in so that I can finally get out from three weeks ago, bro. I got so tired of everybody just complaining about nights that I put everybody in the morning and myself by myself at night seven nights. I said, you know what? I'm tired of hearing all y'all just bitch. I told myself, I'm like, everybody's in the morning. I had four or five people working in the morning and I was just by myself every single night. It's just so frustrating, bro. Sometimes I'm like then because I can, can't never get everything that I wanted to do done because they would basically,

Kevin (15:17):

This transcript was exported on Jan 13, 2025 - view latest version here.

Yeah,

Victor (15:18):

They're just piling on top of each other in the morning. And I'm like, I'm looking at Ms. Patty, miss what you doing? You've just been walking around smoking cigarettes all day.

Kevin (15:27):

Yeah. Well, do you think you're going to come back?

Victor (15:35):

Because after that, what happened is after that I tried telling Reggie because that next day after that investigation, he called me, she was still there. I was on the phone with the guy for an hour and I mean, justifiably, I was pissed off. I don't want to say something, you know what I mean? Just I know There no retaliation or nothing like that. So I tried separate myself from the situation and I was like, okay, I'm going to leave for a little bit. And then I tried letting Reggie know about how I didn't feel comfortable being there with Destiny. As long as she's there, I don't want to be there. And he said I could face disciplinary actions if I didn't show up. Alright. What?

Kevin (16:31):

Yeah, it's because they were looking for you.

Victor (16:35):

Alright.

Kevin (16:35):

They were looking for you. And I was like, dude even asked me, have you talked to Richard originally? Have you talked to Richard? I'm like, no, I haven't talked to him since. I told him about a Rosemary being a little, I told her about a Rosemary being a little jerk, I guess. I was like, yeah, she's like going over him and calling me and stuff. I'm like, go call Victor because Rosemary does it. Sometimes she'll call me or call Reggie working.

Victor (17:11):

Oh

Kevin (17:12):

My God. I dunno.

Victor (17:14):

And that day that she called Reggie that day that she called Reggie, I was actually helping my pharmacy manager fix his car and I just didn't get done in time. And I was like, I'm just helping up fellow quality, man. I, I'm not slacking off or doing something. But either way, I asked her, why are you trying to get me fired? Doesn't matter what I did to you. I'm not trying to get you fired. You just need to pull your weight. You need to work around here more. I'm like, we don't even really see you. I'm like, because none of y'all want to work nights.

Kevin (18:00):

This transcript was exported on Jan 13, 2025 - view latest version here.

Yeah.

Victor  (18:03):

Look at my schedule for the last, since I've been there, I'm literally a night shift. Yeah. They keep messing things up, things up. They didn't scan, didn't the of the week. And I'm like, they're

Kevin  (18:20):

Like, oh, we thought it was, yeah.

Victor  (18:22):

And I'm like, there's a calendar in the back that I put, how can you think something? Just look at the fucking calendar. And then when I addressed it to them, when I addressed it to Rosemary and I was like, so do you not know how this works? No. Yeah, we're dumb. We don't know nothing. And I'm like, I'm not even being disrespectful. I was just saying, do we need to go over this again? I'm just asking you do you not know how it works? Because out of three shifts, not one knew that it was scandal. Six in one week. I was like, why? How do you not know? We went over this.

Kevin  (19:09):

Yeah,

Kevin (19:11):

The big letter.

Victor  (19:12):

Yeah, it's a whole red ass color throughout the whole week.

Kevin (19:16):

Yeah,

Victor  (19:18):

The

Kevin (19:19):

Purple one. That was not No dude, that's not

Victor  (19:22):

The purple one wasn't even nowhere anywhere.

Kevin (19:26):

I think Rosemary had it in her folder.

Victor  (19:29):

I don't know for what, but either way, man. Well, I mean I tried telling Reggie that stuff and the day after they called me over that sexual harassment thing, bro, I called leave. I mean leave harassment. I told him everything's going on and yeah, I'm talking to him, what is it called? Short term disability and workers'

This transcript was exported on Jan 13, 2025 - view latest version here.

comp and all that stuff. So I'm taking counseling sessions and all kinds of stuff. All kinds of stuff, man. I told him, man, I was like, man, I've never been that type of person to do anything like that. Yeah, dude.

Kevin (20:15):

Yeah, dude. Everyone there told me to watch out for her and I don't think any of them really knew or if they knew they weren't telling me. But otherwise they were like, watch out. Brandon was saying that I,

Victor (20:33):

Yeah. And like I said, man, I mean they told me that too because I didn't even schedule myself to work with her until it was like months. No, not even months, like weeks. It was like weeks or days. Last weeks I remember she switched over and I didn't work with her for the longest. And that's one thing that I wanted to bring up to investigators too. Go look at the schedules. You think if I wanted actually be around her, I would've just scheduled myself with her there. Go look at the fucking schedules. I took her off the schedule because of her availability.

(21:16):

There's the messages where she says, and I responded to her, I have updated your availability to nothing but mornings and right now we have no open shifts in the morning so you can take the week off. I literally told her that. He's like, well, why aren't you giving her 40 hours? Because of her availability. And then they told me that, I don't know who was making the schedule, but she wanted 40 hours and when she gave her availability, her availability was only 32. How the fuck you don't give somebody 40 hours when they can only make 32

Kevin (21:57):

And

Kevin (21:57):

You don't have the hours? You never had the hours. Anyway,

Victor (22:01):

I told her from the beginning, I would give her, I said four closing shifts the very beginning before she moved and then no, but like I said, Reggie, Reggie called me and he told me that I was suspended and all that type of shit that I had to drop off my keys and then not to come back to the store. I'm like, what? For what? Because I don't want to work with somebody who's fucking lying on me because you know what my fear was? If I go to work with her that night, she could easily just say while we're between the house or something when I'm not in the office and she's not in the front that I smacked her ass or I fucking, I'm not going to put myself around that situation because I was supposed to close that night with her. I was having my store meeting with him, but I'm like, bro, this supersedes the fucking store meeting. She could fuck around and get locked up. Yeah, call the cops or something. She could go to her husband, boyfriend, whatever. Oh my God. He grabbed my ass. I get a sexual assault charge or something.

(23:15):

And that must defend. Yeah. And then we don't have cameras there to prove me innocent.

Kevin (23:23):

Fucked up. It is fucked up, dude.

Victor (23:26):

This transcript was exported on Jan 13, 2025 - view latest version here.

I know. I was fucking pissed off, bro. So that's why Reggie was fucking being such a fucking dick, bro. I mean, like I said, I told him, when I told him everything that I've been through, I gave him a small little paragraph about how I didn't feel comfortable and everything. And he said, well, you got to show up anyway, blah, blah, blah. And then you know what he told me, bro? He's like, I'm denying your leave of absence. I'm like, bro, it's not even up to you.

Kevin (23:56):

Yeah, this is hr.

Victor (23:57):

Yeah. Where the fuck did you get in your head? You're just going to deny me. Oh, you didn't show up today? Yeah, of course. I'm fuck no letting show up. Fucked up.

Kevin (24:09):

You're not going to show up. She's there and it's like, fuck, fuck. Because you took someone in and now they are trying to fuck with you. What is he getting the point? What are you trying to get with this? Someone who gives you more time?

Victor (24:21):

And I went up to Reggie and I told him, Hey man, she's doing all this stuff. He didn't do nothing. And then we didn't have no LP guy. We had that Mike or Robbie guy, but he wasn't doing shit. All I kept hearing from him was he's in a class.

Kevin (24:42):

Yeah.

Victor (24:44):

I literally heard he's in a class two or three times. I'm in class right now. I'll get back to you. Wait, what? So no, bro, at this point in time, no. I already called the Texas Woodworth Commission. I already filed sexual harassment on the company.

Kevin (25:06):

Good.

Victor (25:07):

Yeah. I filed it on the whole company because I talked to Gary, I talked to Reggie, I talked to Jennifer, I talked to another person and none of them want to listen to me. I told them, I was like, man, I have these messages on my phone. Just because I don't feel comfortable exposing myself to ridicule doesn't mean that it was right when I finally did let everybody know, everybody treated me if I was lying and I'm like, bro, they're on my phone. These messages. I respected her to the fullest. Even while she was being disrespectful to me, I still still said that I would pray for her.

Kevin (25:57):

She's so fucked up. Go get her. I think she's really get her.

Victor (26:02):

This transcript was exported on Jan 13, 2025 - view latest version here.

Oh yeah. Yeah. It's because all that, I don't know man. I can can probably, man if she's investigated all the way back, bro. I'll be honest, the other day she told me, Hey, did I leave my debit card here? And I said, where? She's like, where? There by my purse. I'm like, well, let me look. I looked around there, I opened up her purse. Man, tell me why there's nothing, but see if you has makeup in there,

Kevin (26:28):
Shut off. Seriously.

Victor  (26:29):
Yeah,

Kevin (26:31):
Dude,

Victor  (26:32):
I want to see receipt for those. She's stealing a lot. She's stealing a lot, bro. The time I caught her stealing wasn't food, bro. She just went and grabbed the fucking lint roller. Expensive as Lin Roller.

Kevin (26:45):
I saw your email. Well, I have access to the hiring email, so I saw things that no one else.

Victor  (26:51):
Yeah, because I tried to use the hiring email because they have access to the other email and I didn't want to worry anybody and alarm and scare anybody, so I was trying to be hush about it. That was what, when did I send that email off?

Kevin  (27:12):
In August.

Victor  (27:13):
In August. Somewhere around back then.

Kevin (27:17):
Yeah. I was looking at it and then everyone helped me. I was like, alright, I'm going to keep this going, so I'm going to try and keep it going to make sure she gets her come up.

Victor  (27:29):
Yeah, no, but man, and then the fucked up thing about it is that I've told, I've talked to so many people though. I talked to, I'm seeing a counselor. I talked to the leave of absence people. They were understanding temporary disability people so I can get paid. They were understanding even the workers' comp lady, she was understanding, I talked to a physician yesterday so that I can go see a psychiatrist. She was understanding, she even put it on the notes when I got the email like, no, he's not ready to return to work. Like, no, yeah, I'm fuck no. That's literally a hostile work environment where, so then I wrote a very long email describing exactly everything that happened from the very beginning, everybody who's not believed me, the proof that I've given, I've attached screenshots of Reggie's conversations and

This transcript was exported on Jan 13, 2025 - view latest version here.

disrespectful the way he talked to me to it, and I'm going to send it from Karen Lynch all the way down to Reggie.

Kevin (28:49):

Nice.

Victor (28:50):

Yeah, so

Kevin (28:53):

As soon as I saw her, I was on the fence and then I looked at her and I was like, definitely seems like the type of person. I was like, yep, I will. Because even I looked, they need didn't tell me anything, but I think she leave because she wasn't saying like, oh, how durable is Victor or anything like that. She was like, you need to be careful around her. You need to be careful around her

Victor (29:23):

Life. Be careful, huh? Yeah, seriously, bro. Be very, very careful and I can tell you that because like I said, she said when I showed her the messages is when she said that I was being sexual harassment towards her and I'm like, I was showing her own messages. What do you mean

Kevin (29:52):

These

Victor (29:52):

Are incoming? Her contact info's on there

Kevin (29:58):

Fucked up. That's literally not you. It's coming from her. Yeah. Fucked up. You just opened that up. She was just mad that you didn't want it. I guess

Victor (30:14):

That's why I was like, I don't know where, I don't know how this all spirals out of control and I don't know what her intentions are. I really don't. I really don't because like I said, for her to accuse me of that, bro, everybody you can talk to, everybody there, Michelle Juana. Anytime I close with anybody, bro, 90% I count the registers. I'm in the office trying to get caught up on my paperwork too. And the reason that all those binders are fucked up is because I have half of them over here that I was working on at my house, and that's why it pissed me off when Rosemary said, oh, you're not doing enough. I'm like, lady, I only get paid for 45 hours. What do you want me to do? Who's going to come in if somebody calls in you for free?

Kevin (31:09):

Yeah. She, God.

Victor (31:15):

And I don't know what happened to Rosemary, but she just went off the deep end and now Michelle thinks that Rosemary and Destiny's girl working together, so be careful around as well because

This transcript was exported on Jan 13, 2025 - view latest version here.

Kevin (31:29):

No, I believe that Michelle was telling me everything. I really trust her. I think she,

Victor (31:33):

Yeah, Michelle is really trying to, I trust Michelle as well, but Rosemary was lying about Michelle, about Juana, and she was like, something about, I'm sorry girls, I threw you out under the bus when I was talking to Victor. Well, the girls don't like it when you're doing this. Doing what? When I go on lunch, you do know I work a whole ass fucking from open to close. I wanted to tell what do people who work more than eight hours get a 15 minute break, a 30 minute lunch and a 15 minute break. My lunches are automatically calculated in this.

Kevin (32:24):

Yeah,

Victor (32:26):

I don't have a meal waiver. There's no way to do a meal waiver. And I'm like, do you even realize that? Oh, I didn't know. I didn't know. Oh man. Fucking

Kevin (32:41):

About us,

Victor (32:41):

Man. I know.

Kevin (32:44):

I saw Norma too. She came in, she was like, oh, I'm coming back, back. And the whole time Michelle was just talking shit about her, dude, I need to transit. I did not want her back.

Victor (32:55):

Yeah, Michelle says, yeah, she was started talking about wedding and everything. I told her, it's really not a bad job when it comes to anybody who's not a store manager because like I said, as a store manager, I told her it sucks. I have Rosemary that I need to report to and I've read you that I need to report to. And it is like, Hey Rosemary, I'm going to leave a little bit early today because tomorrow I need to come in early to get ready for Reggie. Okay, I'm going to make up all my hours. Then I'm like, what? That's ridiculous. Even and even during my fucking paid time, off vacation, whatever, bro, I still had to go to the store to get changed because Rosemary refused to go.

Kevin (33:45):

Yeah, you go refuse to do office work. What does she do? What does the pad, they don't do anything.

Victor (33:51):

No, they don't do anything. Yeah. You can literally go back on the cameras and look at everything that they've done and it's literally been Z.

Kevin (34:00):

You don't even have to just look around.

This transcript was exported on Jan 13, 2025 - view latest version here.

Victor (34:02):

Yeah, I just did. Yeah.

Kevin (34:06):

I mean, there's only so much one person can do.

Victor (34:09):

Yeah, and that's why, yeah, I really don't, after I email everybody, I really don't ever, ever see getting this back, the position back. But I don't know. I still have to wait and there's going to be some mediation or something, a case and all that stuff. We'll

Kevin (34:37):

See what happens. Yeah. If you end up going back, it's probably not going to be at that store.

Victor (34:41):

Yeah, I don't think. Well, I mean if it's going to be, yeah, I don't really see it happening anywhere. I'll be honest, bro. I emailed the CEO, whatever, Lynch, I emailed her exactly what was happening. I mean, obviously I didn't get no response, but then my girlfriend is actually the one that had that idea. She was like, why don't you just, they're going to fire you already. You already know. I mean, you already suspended. They already took your keys away. Just fuck it. Just email everybody. Make it so big that it's impossible to ignore her. And I'm like, you're right. Because if I email, it's like Rosemary doesn't really talk to none of them really talk to Reggie, but I talk to Reggie a little bit more. But that's because you're talking about the next level up, you see, and then I don't talk to Amanda, but Reggie talks to Amanda. That's the next level up. And I'm like, well, fuck it. I'm just going to add Reggie's messages on there and I'm going to add everything that I have. I'm going to attach it to that email and I'm going to send it to everybody. Good. And I'm going to just fuck it. I'm going to blow it wide open. I told yeah, no, you told Yeah. Alright,

Kevin (36:03):

I got to

Victor (36:04):

Go. Alright. If you want me to attach you, you got to send me an email man. Only you I email. Yeah. So I can attach you to it because I'm going to put 50 people on it. Yeah, it's seriously going to be about 50 people. Yeah. Alright.

Kevin (36:26):

Maybe I will.

Victor (36:27):

Yeah, lemme know. Alright, I'll just send you a picture of it. Oh yeah. Okay. I'll send you a screenshot. Alright. Bye.